**L.G., Petitioner,**

v.

**The PEOPLE of the State of
Colorado, Respondent.**

**In the Interest of K.G., a Child,
and Concerning M.G.**

No. 93SC687.

Supreme Court of Colorado,
En Banc.

Feb. 21, 1995.

Rehearing Denied March 20, 1995.

The Law Office of John B. Ciccolella, P.C., Colorado Springs, for petitioner.

Office of County Atty., El Paso County, Beth Whittier, County Atty., Judith L. Hufford, Chief Deputy County Atty., Colorado Springs, for respondent.

The Law Office of Elizabeth Tormoen Hickey, Elizabeth Tormoen Hickey, Colorado Springs, guardian ad litem for K.G.

Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to consider the court of appeals' opinion in *People in the Interest of K.G.*, 876 P.2d 1 (Colo.App.1993). The court of appeals held that the Colorado juvenile court (the juvenile court), acting on a petition in dependency and neglect filed by the State of Colorado in the interest of K.G. (the child or K.G.), was without jurisdiction, under 28 U.S.C. § 1738A (1988) (the Parental Kidnaping Prevention Act of 1980 [1] (PKPA)), to modify the visitation rights of L.G. (the father or L.G.), which were provided for as part of a divorce decree in Oklahoma.

We find that the juvenile court, acting in the best interests of the child on a State-initiated petition in dependency and neglect, had subject matter jurisdiction under the Uniform Child Custody Jurisdiction Act, codified in Colorado at section 14–13–101 to –126, 6B C.R.S. (1987 & 1994 Supp.) (UCCJA), and under the dependency and neglect provisions of the Colorado Children's Code,[2] §§ 19–3–101 to –703, 8B C.R.S. (1994 Supp.) (the Children's Code), to issue orders designed to protect the safety of K.G., even if those orders limited the father's visitation rights. We also find that the PKPA does not apply to proceedings in dependency and neglect, and does not therefore preempt state law. Accordingly, we reverse.

## I.

L.G. and M.G. (the mother or M.G.) were married in Oklahoma City, Oklahoma, in August 1985, and on March 3, 1987, L.G. and M.G. had a daughter, K.G. In February 1990, L.G. and M.G. divorced in Oklahoma, and in March 1990, M.G. and K.G. moved to Monument, Colorado, in El Paso County. Since March of 1990, both M.G. and K.G. have been residents of Colorado.

---

1. Parental Kidnaping Prevention Act of 1980, Pub.L. No. 96–611, § 8(a), 94 Stat. 3568, 3569 (1980) (codified as amended at 28 U.S.C. § 1738A); *see generally* Parental Kidnaping Prevention Act of 1980, Pub.L. No. 96–611, §§ 6 to 10, 94 Stat. 3568 (1980) (codified as amended in scattered sections of 28 U.S.C. and 42 U.S.C.).

2. Colorado Children's Code, §§ 19–1–101 to 19–6–106, 8B C.R.S. (1994 Supp.).

K.G. visited her father in Oklahoma during February 1991. When she returned to Colorado, K.G. made some complaints to her mother which prompted her mother to contact K.G.'s pediatrician. On March 1, 1991, K.G. was examined by her pediatrician. After the examination, the pediatrician had a conversation with K.G. which led him to suspect that K.G. had been sexually abused. As he was required to do under section 19–3–304, 8B C.R.S. (1994 Supp.), the pediatrician contacted the El Paso County Department of Social Services (the DSS) to report his suspicions.

### A. The Oklahoma Proceedings

On February 9, 1990, the Oklahoma County District Court (Oklahoma court) entered a divorce decree, dissolving the marriage of L.G. and M.G. In the decree, the Oklahoma court awarded exclusive care, custody, and control of K.G. to the mother, subject to L.G.'s rights of visitation. The court also granted the mother permission to move to Colorado with K.G., for the purpose of establishing permanent residence there. The divorce decree included a visitation schedule, allowing L.G. visitation with K.G., in Oklahoma, one week per month until K.G. started kindergarten, and thereafter providing for periodic visitation on holidays and during the summer school recess.

On April 11, 1991, the mother filed a motion in the Oklahoma court, seeking to terminate the father's visitation rights during the investigation of the sexual abuse charges. The mother alleged that the father had been sexually abusive to K.G. during K.G.'s visit in February, and that both the Oklahoma City and the Colorado Springs Police Departments were investigating the charges.

Later, on June 14, 1991, the mother filed a motion in the Oklahoma court requesting the Oklahoma court to decline jurisdiction in favor of Colorado. In the motion, the mother requested the court to decline jurisdiction, on

the ground that Colorado was the more appropriate forum.

The Oklahoma court held a hearing on June 14, 1991, to consider the mother's motion for termination of the father's visitation rights, and the mother's request that the Oklahoma court transfer the case to Colorado. The court thereafter entered a written order finding that it retained continuing jurisdiction of the matter, and denied the mother's motion to decline jurisdiction in favor of Colorado. The Oklahoma court did not rule on the mother's motion to terminate visitation, but instead set her motion for a later hearing. The Oklahoma court ruled that, pending the later hearing, the father's visitations with K.G. were to be supervised, and K.G. was not to sleep overnight at her father's house.[3] Additionally, the court ordered L.G. and M.G. to undergo full psychological examinations by different clinical psychologists, both separately and with K.G. present. Upon completion of the exams, the court ordered the psychologists to confer and submit a joint recommendation based on their findings to the Oklahoma court, the Colorado juvenile court, and the parties.

On June 21, 1991, the mother filed a "Motion for Court Instruction" with the Oklahoma court. The mother maintained that the Oklahoma order of June 14, 1991, which allowed the father to have supervised visitation, was in direct conflict with a Colorado order of June 20, 1991, which forbade K.G. from leaving Colorado, and forbade visitation by the father except during therapy sessions. The mother requested the Oklahoma court to confer with the juvenile court and to come to some resolution on the jurisdictional issue.

Nearly a week later, on June 27, 1991, the parties' attorneys met with Oklahoma Judge Henderson for a special hearing. The mother's counsel asked Judge Henderson to reconsider his decision not to transfer the case to Colorado, and in the alternative to vacate that part of his order providing for supervised visitation. The Oklahoma court denied

---

**3.** Throughout the record, the Oklahoma court and the parties occasionally refer to the Oklahoma court's order as a stipulation agreement. Apparently, the parties met in Oklahoma sometime prior to the order and negotiated the terms

of the order. At a later hearing in Colorado, M.G. indicated that she signed the agreement under "duration [sic]," presumably meaning duress.

those motions, and held the mother's motion for court instruction in abeyance.

On July 10, 1991, the father filed several motions in the Oklahoma court, on the ground that the mother had not complied with the Oklahoma order allowing the father supervised visitation with K.G. Specifically, the father filed an application for a contempt citation against M.G. (upon which the court ordered M.G. to appear on July 31, 1991, and to show cause why she should not be jailed for contempt of court), a motion for temporary custody of K.G., and a motion to change custody of K.G. to the father.

On November 18, 1991, the Oklahoma court held a motions hearing at which both the mother and father presented evidence. The father and mother, as well as K.G.'s paternal grandparents and the parties' counsel were present at the hearing. In an order issued on November 27, 1991, the Oklahoma court found that the mother had failed to establish her burden of proof with respect to her motion to terminate the father's visitation. Accordingly, the court vacated its temporary order of June 14, 1991, which had ordered that the father's visitation be supervised. The court also refused to modify custody in favor of the father, and released the mother from the previously issued contempt order.[4]

### B. The Colorado Proceedings

Meanwhile, the DSS, acting on the results of its investigation of sexual abuse of K.G., filed a motion on April 18, 1991 for Temporary Custody, requesting that the court place K.G. in the DSS's protective supervision for ninety days, and that the court continue physical custody in the mother, pursuant to a stipulation agreement reached between the DSS's case worker, a county attorney, and the mother. The stipulation agreement also provided that the father was to have no contact with K.G. "except in later arranged

therapy." On the same day, after a hearing on the motion for Temporary Custody, the juvenile magistrate granted the DSS's motion and issued an order for protective supervision of K.G. for ninety days. The juvenile court also appointed a guardian ad litem for the child.[5]

On May 1, 1991, the DSS, through the office of the county attorney, filed a petition in dependency and neglect with the juvenile court, in the interest of K.G.[6] In the petition, the DSS alleged that K.G. was dependent and neglected, under section 19–3–102, 8B C.R.S. (1994 Supp.), as a result of the father's sexual abuse of K.G. The juvenile court found that the filing of the petition was in the best interests of K.G., directed the clerk of the court to issue summons to all parties involved, and set a hearing on the petition for June 10, 1991.

At the June 10, 1991 hearing, and later in a written motion to dismiss, the father entered a limited appearance through his attorney for the purpose of challenging Colorado's jurisdiction. The father argued that the juvenile court was without personal jurisdiction over him, and that Oklahoma had exclusive jurisdiction on the issue of custody of K.G., under the PKPA.

The juvenile court issued its order on June 17, 1991. The court found that it had jurisdiction over the case, denied the father's motion to dismiss, and continued its previous protective order. The court also ruled that "a copy of this Court's order prohibiting contact between the subject child and the Respondent, [L.G.], shall be served on said Respondent."

The father then filed a motion in the juvenile court for review of the juvenile magistrate's ruling that Colorado had jurisdiction over K.G. While that motion for review was pending, on June 20, 1991, the juvenile court held a temporary custody hearing. At the

---

4. Additionally, the Oklahoma court denied a motion previously filed by K.G.'s paternal grandparents for grandparental visitation rights.

5. On April 16, 1991, the Department gave both the mother and father notice of the date, time, and place of the temporary custody hearing on its impending motion for Temporary Custody.

6. It is important to note that, although the DSS initiated and pursued a petition in dependency and neglect in Colorado, the DSS was never involved, and was never a party to, the Oklahoma proceedings.

hearing, Juvenile Magistrate Walter indicated that she had spoken with the Oklahoma judge handling the proceedings there, Judge Henderson. Magistrate Walter said that Judge Henderson believed that Oklahoma had jurisdiction, and that there were sufficient safeguards to protect K.G., namely, his order requiring supervised visitation. Magistrate Walter made it clear that the juvenile court would retain jurisdiction if it became apparent at the hearing that there were protective issues not adequately addressed by the Oklahoma order. The father again made a limited appearance, through his attorney, for the purpose of contesting Colorado's jurisdiction. The father was not present.

The juvenile court heard testimony from a Colorado Springs psychotherapist who met with K.G. fifteen times from March through June 1991. The psychotherapist testified that K.G. told her that her father had touched her private parts at least two times, and that on one occasion her father told her not to tell anyone. The psychotherapist also testified that she was concerned about any contact K.G. would have with her father under the Oklahoma order, in light of her conversations with K.G., during which K.G. indicated that she was "sick of Daddy's house," and that she did not want to be alone with him.

The juvenile court also admitted the deposition of the pediatrician to whom K.G. made her initial statements regarding sexual abuse. Based on the evidence submitted at the hearing, the juvenile court concluded that there were "sufficient protective issues which require[d] [the] Court to exercise jurisdiction," and that the safeguards in the Oklahoma order regarding supervised visitation were inadequate to protect K.G. The juvenile court entered an order on or about June 20, 1991, requiring the mother to find a new therapist for K.G. The court further ordered that the father could visit K.G., but only during therapy sessions in Colorado. The court ruled that K.G. was not to be removed from Colorado. Finally, the court set the matter for further proceedings on the petition in dependency and neglect, on July 24, 1991.

On July 18, 1991, in an attempt to avoid a contempt citation from the Oklahoma court, the mother filed a motion with the juvenile court for an expedited hearing, and requested the juvenile court to contact Oklahoma Judge Henderson to try to resolve the ongoing jurisdictional dispute.

As a result of the mother's motion for an expedited hearing, District Judge Toth set a hearing for July 25, 1991. During the hearing, which occurred on July 25 and 26, 1991, the court considered the father's motion to review Juvenile Magistrate Walter's conclusion that Colorado had jurisdiction in the case. Again, the father's counsel made a limited appearance on the father's behalf. The father was not present.

In his ruling, Judge Toth found that Colorado was the home state of K.G., and that the juvenile court had a *parens patriae* duty to assume jurisdiction over her for the purposes of protecting her. The judge found that the PKPA did not apply to this case. The judge further found that Oklahoma and Colorado had concurrent jurisdiction in the case, and indicated that he would attempt to contact Oklahoma Judge Henderson in order to avoid a jurisdictional dispute. Finally, the court ruled that all previous orders of Magistrate Judge Walter were continued in full force and effect.

On the mother's motion, on July 26, 1991, the case was transferred to Judge Toth. Thereafter, on July 29, 1991, the juvenile court held a hearing at which Judge Toth phoned Oklahoma Judge Henderson to discuss the jurisdictional issue. Initially, Judge Henderson refused to turn the case over to Colorado. As the conversation progressed, Judge Henderson agreed to get back to Judge Toth after he had a chance to talk to the Oklahoma attorneys involved in the case.

On August 20, 1991, the juvenile court held a hearing at which Judge Toth made a record of his communications with Oklahoma Judge Henderson. After their July 29, 1991 discussion, the judges did not communicate further about the jurisdictional dilemma. Judge Toth felt that Judge Henderson had violated the UCCJA by refusing to discuss the issue with him.

In a motion filed in Colorado on September 6, 1991, the mother informed the juvenile court that the Oklahoma court had set her motion for termination of visitation, and the father's motions for contempt and modification of custody, for hearing on October 8, 1991. The mother explained that the Oklahoma court, on September 3, 1991, had "strongly suggested" to her to bring K.G. to Oklahoma for an evaluation by the father's psychologist prior to the October 8, 1991 hearing. The mother requested the court to clarify its order, specifically, whether K.G. could be transported to Oklahoma for that purpose.

In response, on September 16, 1991, the juvenile court found that K.G. was not to leave Colorado for any reason, and that the father was to have no contact with K.G. except under the supervision of the child's therapist. The juvenile court further clarified its order on October 1, 1991, by holding that the September 16, 1991 order was a continuation of the protective order previously issued.

At the end of April 1992, a jury trial was held on the DSS's petition in dependency and neglect. The DSS, as petitioner, was represented by an attorney and by a social worker. K.G. was present through her guardian ad litem, and the father made an appearance with his counsel.[7] The jury found that K.G. was lacking in proper parental care as a result of her father's acts or failures to act, and additionally determined that K.G.'s environment was injurious to her welfare as a result of her father's acts or failures to act.

On May 6, 1992, the juvenile court issued an order sustaining the petition in dependency and neglect against L.G., and adjudicating K.G. as dependent and neglected as to both the mother and the father. The court vested legal and physical custody of K.G. in the mother, subject to the DSS's protective supervision. A dispositional hearing was set for June 11, 1992.

Prior to the dispositional hearing, the DSS prepared a pre-dispositional report and treatment plan. The treatment plan recommended that L.G. participate in individual and group therapy, and father/daughter therapy, until such time as the therapists, the DSS caseworker, and the guardian ad litem approved of the termination of the therapy. The plan further provided that L.G. would fully cooperate with the therapists and caseworkers involved, and that he would undergo a complete psychological assessment by a psychologist skilled in the area of incest and sexual abuse. The plan recommended that L.G. be allowed phone contact with K.G., but that visitation was permitted only on recommendation of the therapist, the caseworker, and the guardian ad litem.

Regarding the mother, the treatment plan suggested that she attend group therapy, that she ensure that K.G. attend her recommended therapy sessions, and that she cooperate with visitation recommendations of the involved professionals.

The treatment plan also provided for therapy for K.G., to be continued until the therapists, case worker, and guardian ad litem recommended that therapy was no longer necessary. The plan provided that none of the parties was to discuss the allegations outside of the therapeutic setting. Finally, the plan recommended that, although reunification of the family was part of the case plan, any visitation in the father's home was currently contrary to K.G.'s welfare.

At the dispositional hearing, the father, through his attorney, objected to the treatment plan. The juvenile court therefore set the case for a contested dispositional hearing on June 17, 1992. In its order, however, the court adopted the treatment plan as it pertained to the mother, finding that it was both appropriate and in the best interests of the child.

On July 7, 1992, the court held a hearing on the contested disposition. In an order dated August 18, 1992, the court again found that the treatment plan was in the best interests of the child, and therefore adopted it in full. In addition to its other orders, the court held that the father should attempt to

---

7. The record does not contain a transcript of the trial, and there is no indication in the record of who testified at the trial.

find an appropriate person in Oklahoma City, Oklahoma, to supervise visitation, subject to the approval of that person by the case worker and the guardian ad litem. Finally, the court ordered a progress report to be submitted on October 7, 1992.

On October 6, 1992, the DSS filed its progress report. The DSS recommended that it would be contrary to K.G.'s best interests to allow visitation with her father in her father's home. Acting on the DSS's recommendation, the court continued the DSS's protective supervision over K.G. and ordered a further written review for April 5, 1993. The record does not reveal the result of that review.

The father appealed both the judgment entered on the jury verdict, sustaining the petition in dependency and neglect, and the later order adopting the treatment plan, to the court of appeals. The father argued that the PKPA preempted Colorado law on interstate custody under the UCCJA, and that Colorado was therefore without jurisdiction to modify the father's visitation with K.G. The father asserted that Oklahoma was the only state with jurisdiction under those acts to modify the custody decree.[8]

The court of appeals first found that Colorado's dependency and neglect proceedings were governed by the UCCJA. The court of appeals concluded, after an analysis of the UCCJA, that the juvenile court did not abuse its discretion in asserting its jurisdiction over the case.

The court of appeals nevertheless found that Colorado did not have jurisdiction to modify the father's visitation rights under the PKPA. The court of appeals reasoned that, since the UCCJA included dependency and neglect proceedings, and since the PKPA governed custody determinations made under the UCCJA, the PKPA applied to dependency and neglect proceedings. The court of appeals concluded that, under Oklahoma law,

Oklahoma retained jurisdiction to modify custody, as the original custody decree state, as long as one parent continued to reside in Oklahoma and if the child's visitation in Oklahoma provided significant parental contact, even if Oklahoma was not the child's home state. The court found that, even though Colorado had jurisdiction and could have exercised that jurisdiction under the UCCJA, it was required to decline jurisdiction in favor of Oklahoma under the PKPA. Accordingly, the court of appeals reversed that part of the dispositional order which modified the father's visitation rights.[9]

## II.

The sole issue on appeal is whether Colorado had subject matter jurisdiction to enter dispositional orders on a petition in dependency and neglect filed by the State on behalf of K.G., when an effect of the court's orders was to alter the father's visitation rights. The father argues that the Colorado proceedings on the petition in dependency and neglect, which altered his visitation rights, improperly modified the original Oklahoma custody decree, and that, under the UCCJA, Oklahoma was the sole state with jurisdiction to modify its original custody order. The father additionally argues that, even if the UCCJA is interpreted to allow concurrent jurisdiction in Oklahoma and Colorado, the PKPA preempts state law and provides that Oklahoma, as the original decree state, is the only state with jurisdiction to modify its original decree.

We disagree. We find that Colorado has jurisdiction under the UCCJA to consider the State's petition in dependency and neglect in the interest of K.G., and that the juvenile court was authorized under the Children's Code to place limitations on the father's visitation rights. We also find that the PKPA does not preempt state law on this

---

8. The father also argued that the sustained petition in dependency and neglect was ineffective as to him because the acts alleged did not take place in Colorado. He further asserted that the dispositional order could not require him to engage in treatment unless the jury specifically found that his acts caused K.G. to lack proper parental care, and that those acts occurred in Colorado.

The father's contentions in this regard are not before this court.

9. The court of appeals rejected the father's argument that the sustained petition in dependency and neglect was ineffective as to him because it was not specific and because the acts did not occur in Colorado.

matter, because the PKPA does not apply to proceedings in dependency and neglect.

Our resolution of this case requires us to examine three separate statutory provisions: the Children's Code, the UCCJA, and the PKPA. Central to our analysis is the recognition that the Children's Code, the UCCJA, and the PKPA serve separate and distinct purposes.

### A.

■ Through the Children's Code, the legislature has provided a legislative scheme to address the particular problems of Colorado children involved in delinquency, dependency and neglect, parentage, relinquishment and adoption, and child support proceedings.[10] The overriding purpose of the Children's Code is to protect the welfare and safety of Colorado children by providing procedures through which their best interests can be served. *See* § 19–1–102, 8B C.R.S. (1994 Supp.). Under the Children's Code, the State of Colorado acts as *parens patriae*—sovereign guardian—to safeguard the interests of vulnerable children within the state. *People in the Interest of D.A.K.,* 198 Colo. 11, 16, 596 P.2d 747, 751 (1979) (recognizing that, when the State is in the position of *parens patriae,* "the matter for determination is what will best serve the interests of the child"), *appeal dismissed sub nom. J.K.S. v. Colorado,* 444 U.S. 987, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).

In keeping with this objective, the legislature has given Colorado wide latitude in protecting the best interests of a child who is suspected to be the victim of abuse or neglect. The paramount concern in such a case is to protect the child from any further harm as the result of abuse or neglect. *See* § 19–3–302, 8B C.R.S. (1994 Supp.) ("[I]t is the

intent of the general assembly to protect the best interests of children of this state and to offer protective services in order to prevent any further harm to a child suffering from abuse.").

First, section 19–3–304, 8B C.R.S. (1994 Supp.), requires health care professionals, teachers, and other professionals to report instances of suspected child abuse or neglect to either the local county department of social services or the local law enforcement agency. The state agency is then required to inform the juvenile court that the child alleged to have been abused may be dependent and neglected. § 19–3–312(1), 8B C.R.S. (1994 Supp.). The juvenile court is given exclusive jurisdiction over proceedings involving dependent and neglected children under section 19–1–104(1)(b), 8B C.R.S. (1994 Supp.).

■ If the court finds that the child has been subjected to abuse, and that the best interests of the child require protection from further abuse, the court may order the state agency to file a petition in dependency and neglect. § 19–3–501, 8B C.R.S. (1994 Supp.). This petition is filed by the People of the State of Colorado in the interest of the child, § 19–3–502(1), 8B C.R.S. (1994 Supp.), with the person alleged to have caused or permitted the abuse named as respondent. § 19–3–312(2), 8B C.R.S. (1994 Supp.). The State is the *exclusive* party entitled to bring a petition in dependency and neglect. *McCall v. District Court,* 651 P.2d 392, 394 (Colo. 1982).[11]

Once the petition process is initiated by the state agency, the court sets the matter for an adjudicatory hearing. § 19–3–505, 8B C.R.S. (1994 Supp.). At the hearing, if the allegations of abuse or neglect are supported by a preponderance of the evidence, the peti-

10. *See* §§ 19–2–101 to –1608, 8B C.R.S. (1994 Supp.) (delinquency); §§ 19–3–100.5 to –703, 8B C.R.S. (1994 Supp.) (dependency and neglect); §§ 19–4–101 to –130, 8B C.R.S. (1994 Supp.) (parentage); 19–5–100.2 to –403, 8B C.R.S. (1994 Supp.) (relinquishment and adoption); §§ 19–6–101 to –106, 8B C.R.S. (1994 Supp.) (child support).

11. If the child's safety appears to be in serious danger, the agency may take the child into pro-

tective custody without a court order, and before the charges resulting in the petition are even set for a hearing. *See* § 19–3–401, 8B C.R.S. (1994 Supp.) (allowing for the immediate removal of a child from child's home when "there is no other reasonable way to protect the child"); § 19–3–308(4)(b), 8B C.R.S. (1994 Supp.) (also allowing for immediate removal of the child when necessary to protect the child from intrafamilial abuse).

tion is sustained as to the child, and the juvenile court then makes an order of adjudication setting forth whether the child is dependent and neglected. § 19–3–505(7)(a), 8B C.R.S. (1994 Supp.).

The second phase of the dependency and neglect proceedings is the dispositional phase. After a hearing, the court generally enters a disposition approving a treatment plan for the child and the respondents. § 19–3–508(1)(e)(I), 8B C.R.S. (1994 Supp.). Under the Children's Code, the court has a myriad of remedies available to it when formulating a treatment plan.[12] The goal of the plan is to reunite the family, as long as it is in the child's best interests to do so. § 19–3–507(1)(b), 8B C.R.S. (1994 Supp.); *E.O. v. People,* 854 P.2d 797, 800 (Colo.1993).

■ An action in dependency and neglect is therefore different from the typical adversarial proceeding in district court. The proceeding is initiated by the State, through the department of social services, and although the parents are normally named as respondents in the petition, the purpose of the proceeding is not to adjudicate their rights, but to protect the safety of the child. Likewise, the juvenile court's orders are meant solely to protect the child from harm. It is not the State's objective, when acting on a petition for dependency and neglect, to punish the persons responsible for the conduct involving the child. *People in the Interest of D.A.K.,* 198 Colo. at 17, 596 P.2d at 751. Rather, the entire focus of the proceedings in a dependency and neglect action is to protect and shelter children who are susceptible to profound harm from the effects of abuse and neglect. In a dependency and neglect situation, therefore, the safety of the Colorado child, and not the custodial interest of the parent, is the paramount concern.

**B.**

**1.**

The UCCJA, in contrast, is strictly jurisdictional legislation which was promulgated for entirely different purposes. The UCCJA was developed by the National Conference of Commissions on Uniform State Laws in 1968, and was adopted in Colorado in 1973, nearly verbatim.[13]

■ The Prefatory Note to the UCCJA, which was included by the National Conference of Commissions on Uniform State Laws, makes it clear that the framers of the UCCJA sought to remedy what had become a rather common and unfortunate occurrence among the states. Specifically, the Commission found that non-custodial parents, unhappy with a child custody decree in one state, would snatch children to another state in the hopes of securing a more favorable custody decree in the new state. The Commission recognized that children subjected to being jostled from state to state, caught in the middle between their warring parents, were at risk of serious harm:

> The harm done to children by these experiences can hardly be overestimated.... A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society.

Uniform Child Custody Jurisdiction Act [hereinafter "Unif. CCJA"], Prefatory Note, 9 U.L.A. 115, 116 (1988). Accordingly, the UCCJA was enacted to extend the notion of full faith and credit to child custody decrees, and to therefore discourage the non-custodial parent from resorting to kidnapping to accomplish the parent's selfish motives. *See Wheeler v. District Court,* 186 Colo. 218, 220,

---

12. The court may place legal custody of the child with either or both parents, a guardian, § 19–3–508(1)(a), 8B C.R.S. (1994 Supp.); a suitable relative, § 19–3–508(1)(b), 8B C.R.S. (1994 Supp.); or with the Department, § 19–3–508(1)(c), 8B C.R.S. (1994 Supp.). The court may order an examination of the child, and may order the child hospitalized. § 19–3–508(1)(d)(I), 8B C.R.S. (1994 Supp.). If necessary, the court may even enter a decree terminat-

ing parental rights. § 19–3–508(4), (5), 8B C.R.S. (1994 Supp.).

13. In the years since its creation, some form of the UCCJA has been adopted in every state and the District of Columbia. *See* Uniform Child Custody Jurisdiction Act, Table of Jurisdictions Wherein Act Has Been Adopted, 9 U.L.A. 20 (1994 Supp.).

526 P.2d 658, 660 (1974) (noting that the provisions of the UCCJA attempt "to eliminate jurisdictional fishing with children as bait").

■■■ To this end, the provisions of the UCCJA seek to limit jurisdiction over custody decrees to one state, thereby eliminating the incentive for forum shopping. *See Nistico v. District Court,* 791 P.2d 1128, 1130 (Colo.1990) ("The UCCJA contemplates that where there is concurrent jurisdiction, only one state should exercise jurisdiction."). One objective of the UCCJA is to provide for jurisdiction in the state which is best suited to determine the custody status of the child. Ideally, the state exercising jurisdiction should be the state with the closest connection with the child and the child's family, and with access to the maximum amount of evidence concerning the child's welfare. *Catlin v. Catlin,* 494 N.W.2d 581, 587 (N.D.1992); *In the Interest of Brandon L.E.,* 183 W.Va. 113, 394 S.E.2d 515, 519 (1990).[14]

In comparing the UCCJA and the Children's Code, it is clear that the two statutes serve distinct purposes. The UCCJA is meant to deter forum shopping in the typical custody dispute, e.g. between persons seeking rights to either custody or visitation. In such a case, the parties who initiate a request for change of custody or visitation, usually the parents, are asking the *divorce* court to determine their rights in custody or visitation of the child. In contrast, in an action for dependency and neglect, the department of social services is the moving party on behalf of the child in the *juvenile* court. While one effect of the proceedings on a petition in dependency and neglect can be an alteration of or a limitation to visitation or custody rights, the purpose of the action is not to determine the custodial rights of the parents, but rather to safeguard the child from potential harm.

Keeping the goals of the UCCJA in mind, our first task is to determine whether Colorado had jurisdiction under the UCCJA to consider the State's petition in dependency and neglect. We conclude that the juvenile court had jurisdiction to issue orders on the petition in dependency and neglect, even though a subsidiary effect of those orders was to place limits on the father's visitation rights. This is so because Oklahoma failed to meet the statutory prerequisites of its own version of the UCCJA. Therefore, Oklahoma did not have jurisdiction under the UCCJA, even though Oklahoma purported to retain jurisdiction. Furthermore, we note that the purposes of the UCCJA would not be furthered if the UCCJA were interpreted to preclude the juvenile court from placing limits on custody or visitation rights pursuant to a petition in dependency and neglect. The UCCJA was not designed to thwart the DSS from protecting a Colorado child from abuse and neglect, but rather was designed to discourage kidnapping by non-custodial parents. This case does not involve a custodial dispute between parties seeking custody of or visitation with K.G., and is not a case of parental forum shopping. Rather, Colorado's only interest in filing the petition in dependency and neglect was to protect K.G. from a potentially abusive situation.

## 2.

■■■ We have recognized that the UCCJA employs a two-part test to determine whether jurisdiction in a custody matter is proper. *Barden v. Blau,* 712 P.2d 481, 484 (Colo. 1986). First, the court must determine, under the requirements of section 14–13–104, 6B C.R.S. (1987), whether it has jurisdiction. If the statute confers jurisdiction, the court must nevertheless determine whether, under other provisions of the UCCJA, the court ought to exercise that jurisdiction. *Id.* This inquiry is necessary, because the application of section 14–13–104, which applies both to initial custody determinations and custody modifications, can result in concurrent juris-

---

**14.** Through its provisions, the UCCJA seeks to: avoid jurisdictional conflict in child custody matters, which results in the harmful shifting of children from state to state; promote cooperation with other states; assure that litigation takes place in the state in which the child and family have the closest connection; promote greater stability of the home environment by discouraging controversies over child custody matters; deter abductions; avoid relitigation and facilitate enforcement of custody decisions; and to promote the exchange of information between states. § 14–13–102, 6B C.R.S. (1987); *E.P. v. District Court,* 696 P.2d 254, 260 (Colo.1985).

diction in two states, contrary to the policies behind the UCCJA. *Id.*

The UCCJA defines its scope of application in section 14–13–103, 6B C.R.S. (1987 & 1994 Supp.). The jurisdictional requirements of the UCCJA apply, under sections 14–13–103(2) and (3), 6B C.R.S. (1987 & 1994 Supp.), to "custody determination[s]" made in "custody proceeding[s]." A "custody proceeding" under the UCCJA

> includes proceedings in which a custody determination is one of several issues, such as an action for divorce, dissolution or marriage, or separation, and includes child neglect and dependency proceedings.

§ 14–13–103(3), 6B C.R.S. (1987); *see also E.P. v. District Court,* 696 P.2d 254, 260–61 (Colo.1985). The most common type of custody proceeding involves a custody dispute among "contestants" (persons claiming a right to custody or visitation with the child).[15] However, the UCCJA expressly includes within its jurisdictional parameters proceedings in dependency and neglect.

■ In addition, within its definition of "custody determination," the UCCJA encompasses not only matters of custody, but also visitation. Under section 14–13–103(2), 6B C.R.S. (1987), of the UCCJA, a "custody determination"

> means a court decision and court orders and instructions providing for the custody of a child, *including visitation rights*; it does not include a decision relating to child support or any other monetary obligation of any person.[16]

(Emphasis added.) Since the UCCJA includes actions in dependency and neglect,

and since the juvenile court may alter custodial or visitation rights pursuant to its dispositional order on a petition for dependency and neglect, the jurisdictional prerequisites of the UCCJA must be satisfied for Colorado to have jurisdiction in this case.[17]

■ The first inquiry under the UCCJA is whether, as a threshold matter, the court could properly assert jurisdiction over the case. Section 14–13–104, which is the principal jurisdictional section of the UCCJA, provides as follows:

> **Jurisdiction.** (1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
>
> (a) This state is the home state of the child at the time of commencement of the proceeding, or had been the child's home state within six months before commencement of the proceeding, and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
>
> (b) It is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this state and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or
>
> (c) The child is physically present in this state and the child has been abandoned or it is necessary in an emergency to protect

---

**15.** Section 14–13–103(1), 6B C.R.S. (1994 Supp.), provides the following definition:

> "Contestant" means a person, including a parent, who claims a right to custody, grandparent visitation rights, or parenting time rights with respect to a child.

**16.** Effective July 1, 1993, the legislature amended the definition of "custody determination" in § 14–13–103(2) to include grandparental visitation rights, and changed the term "visitation rights" to "parenting time rights." Act approved April 30, 1993, ch. 165, sec. 14, 1993 Colo.Sess. Laws 575, 580. In this opinion, we use the term "visitation rights" to refer to parenting time rights. § 14–13–103(2), 6B C.R.S. (1994 Supp.).

**17.** Under § 19–1–104, 8B C.R.S. (1994 Supp.), the juvenile court has exclusive jurisdiction over proceedings in dependency and neglect, "[e]xcept as otherwise provided by law." § 19–1–104(1), 8B C.R.S. (1994 Supp.). We have held that the jurisdiction conferred by § 19–1–104 is therefore limited by other legislative enactments. *Nistico v. District Court,* 791 P.2d 1128, 1129 (Colo.1990) (applying the jurisdictional requirements of the UCCJA to an action for determination of parentage, custody, and visitation under the Uniform Parentage Act, §§ 19–4–101 to –129, 8B C.R.S. (1994 Supp.)).

the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(d) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b), or (c) of this subsection (1), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction.

(2) Except under paragraphs (c) and (d) of subsection (1) of this section, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.

§ 14–13–103(5), 6B C.R.S. (1987).

The statute therefore provides three general bases for an assertion of jurisdiction over a "custody proceeding": (1) if the state is the child's home state,[18] and one parent continues to live in the state even though the child does not; (2) if the child has significant connections with the state so that it is in the child's best interests for the state to assume jurisdiction; and (3) if there is an emergent situation requiring the protection of the child and the child is physically present in the state.

Section 14–13–104(1)(d), 6B C.R.S. (1987), provides one final avenue for the court to

assume jurisdiction. Under that section, Colorado may take jurisdiction of the "custody proceeding" if it appears that no other state would have jurisdiction under the requirements of subsections (a), (b), and (c) of section 14–13–104, or if another state has declined jurisdiction, and if jurisdiction in the state is in the best interests of the child.

Although the juvenile court did not state the basis for its jurisdiction under the UCCJA, we find that Colorado had jurisdiction to rule on the state's petition in dependency and neglect under section 14–13–104(1)(b), 6B C.R.S. (1987).[19] At the time of the filing of the petition, K.G. had been domiciled in Colorado with her mother for over a year. As such, Colorado is more than K.G.'s "home state": it is her state of permanent residence. K.G.'s maternal grandparents live nearby, and she has gone to school in the community. Further, the majority of information relating to K.G.'s future care and protection is located in Colorado. The physician to whom K.G. reported the sexual abuse is located here, as are her therapists, teachers, and friends.

■ Once the jurisdictional prerequisites of section 14–13–104 have been met, the court must still inquire whether it should assert jurisdiction in the case. According to the language of section 14–13–104(1), a Colorado court which meets one of the jurisdictional prerequisites has jurisdiction to enter both an initial custody decree and a modification of the decree. Nonetheless, if the court wants to modify another state's initial custody decree, the court is required to satisfy section 14–13–115, 6B C.R.S. (1987), of the

---

18. Section 14–13–103(5), 6B C.R.S. (1987), provides:

"Home state" means the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period.

The "home state" of the child refers to the child's physical presence in the case, and not the child's legal residence or domicile. *McCarron v. District Court*, 671 P.2d 953, 956 (Colo.1983).

19. Section 14–13–104(1)(b) provides as follows:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

. . . .

(b) [i]t is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this state and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

UCCJA. *See* Unif. CCJA, Comment, 9 U.L.A. 115, 145 (1988) ("Jurisdiction to modify an initial or modification decree of another state is subject to additional restrictions contained in section[ ] [14–13–115.]").

Section 14–13–115 circumscribes the court's jurisdiction to modify custody decrees from other states. That provision provides as follows:

(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree *unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this article or has declined to assume jurisdiction to modify the decree* and the court of this state has jurisdiction.

§ 14–13–115(1), 6B C.R.S. (1987) (emphasis added).[20]

Again, the typical situation in which section 14–13–115 applies is if one of the contestants to the original custody decree sought to modify that decree, for the purpose of securing either custody or further visitation rights with the child. We reemphasize that, in a dependency and neglect action, the court is not "modifying" the custody decree per se. Any limitations on custody or visitation rights that result in a case of dependency and neglect are merely an incidental effect of the overall purpose of the orders—to protect the child.

Nevertheless, we find that the modification provision of the UCCJA, section 14–13–115, does not preclude the juvenile court from properly asserting jurisdiction over the dependency and neglect petition. In this case,

the Oklahoma judge did not decline jurisdiction in favor of Colorado.[21] Under section 14–13–115, therefore, the juvenile court properly exercised jurisdiction only if Oklahoma failed to act "substantially in accordance" with the UCCJA in assuming jurisdiction. Accordingly, we must examine whether Oklahoma conformed to the UCCJA.[22] We conclude that Oklahoma was not substantially in accordance with the requirements of the UCCJA, as required under section 14–13–115, and that Oklahoma's exercise of jurisdiction in this case was improper.

Oklahoma could not assert jurisdiction under the "home state" provision of the UCCJA, § 14–13–104(1)(a), 6B C.R.S. (1987), because Oklahoma was not K.G.'s home state at the time, nor had K.G. lived in Oklahoma for six months preceding Oklahoma's involvement with the case. Rather, K.G. was a resident of Colorado for over a year before the Colorado proceedings were initiated.

In addition, Oklahoma did not have jurisdiction under the "best interests of the child" provision because, although the father lived in Oklahoma, nearly all of the evidence for *K.G.'s* future care was in Colorado, not Oklahoma. In the official comment to the UCCJA, the drafters declared that jurisdiction exists under section 14–13–104(1)(b) "if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state." Unif. CCJA, Comment, 9 U.L.A. 115, 145 (1988) (emphasis added). Therefore, the fact that the father might be inconvenienced by appearing for proceedings related to the petition for dependency and neglect in Colorado is not relevant; rather, the focus is on what would best serve the interests of K.G.

---

**20.** While the state issuing the initial decree ordinarily retains exclusive jurisdiction to later modify the decree, there are factual situations under which the original state can and should lose jurisdiction. *Barden v. Blau,* 712 P.2d 481, 484 (Colo.1986). The drafters commented with regard to this section that, "[i]f ... all the persons involved have moved away *or the contact with the state has otherwise become slight, modification jurisdiction would shift elsewhere."* Unif. CCJA, Comment, 9 U.L.A. 115, 292 (1988) (emphasis added).

**21.** If it had, Colorado would be permitted to assert jurisdiction under § 14–13–115.

**22.** The Oklahoma UCCJA is nearly identical to the Colorado version, and is codified at §§ 501–527 in Title 43 of the Oklahoma Statutes Annotated (West 1990 & Supp.1995).

Under Oklahoma law, the Oklahoma court will have jurisdiction if it meets any one of the general jurisdictional provisions of § 505 of Title 43, Oklahoma Statutes Annotated (West 1990) (substantively identical to § 14–13–104). *Holt v. District Court,* 626 P.2d 1336, 1341 (Okla.1981). The corollary of this is that, if Oklahoma fails to meet any one of the jurisdictional provisions of § 505, the Oklahoma court is without jurisdiction.

Finally, Oklahoma did not have default jurisdiction under section 14–13–104(1)(d) of the UCCJA because Oklahoma was aware of the Colorado proceedings in dependency and neglect, and Colorado clearly could exercise jurisdiction over K.G. under the UCCJA. We also note that the Oklahoma version of the UCCJA contains the following provision: "The controlling criterion for awarding custody by a court of this state shall always be what is in the best interest of the child. . . ." Okla.Stat.Ann. tit. 43, § 505(D) (West 1990). It was not in K.G.'s best interest for Oklahoma to take jurisdiction in this case. The Oklahoma court was aware of Colorado's investigation of sexual abuse, and was aware that the DSS filed a petition in dependency and neglect based on its investigation. Since K.G. was a resident of Colorado, and since she divulged the instances of abuse to health care workers in this state, Colorado was in a better position to assess the allegations, and was in a better position to ensure that she had access to appropriate therapy.[23]

Despite the fact that the juvenile court's order limiting the father's visitation was aimed at protecting K.G., and was not truly a "modification" under the UCCJA, we find that the juvenile court, and not the Oklahoma court, met the statutory requirements of the UCCJA. Since Oklahoma did not meet any of the statutory prerequisites for jurisdiction under the UCCJA, we find that the juvenile court had jurisdiction to limit the father's visitation rights pursuant to the petition in dependency and neglect.[24]

This conclusion is consistent with the overall purposes of the UCCJA. As the drafters of the UCCJA explained, the UCCJA as a whole was designed to deter parental child-snatching and to protect children from the harmful effects of parental forum shopping. However, this case is not a case of parental forum shopping. Rather, the State was the party initiating the proceedings in the juvenile court under the Children's Code for the purpose of safeguarding K.G. The sole purpose of the petition was to protect K.G. from her potentially abusive situation, not to punish her parents and not to side with either parent on the issues of custody or visitation. In filing the petition, the DSS was acting in the best interests of K.G. In *Nistico v. District Court*, 791 P.2d 1128 (Colo.1990), we said that " ' "every child is under the control of the state, and even the paternal right to [the child's] custody and control *must yield to the interest and welfare of the child.*" ' " *Id.* at 1130 (quoting *Department of Social Servs. v. District Court*, 742 P.2d 339, 341 (Colo.1987) (quoting *City & County of Denver v. Juvenile Court*, 182 Colo. 157, 161–62, 511 P.2d 898, 900 (1973))) (emphasis added). Under Colorado's procedures for dependency and neglect, the state is the only party authorized to initiate such a petition, and the interest of the parents in securing custody of the child is not a consideration.

If we were to interpret the UCCJA to preclude Colorado from limiting the father's visitation in its treatment plan, we would

---

**23.** The Oklahoma court could not assert jurisdiction under the emergency provision of the UCCJA, § 14–13–104(1)(c), because K.G. was not present in Oklahoma.

**24.** We note here that Colorado, although it could have, did not need to assert temporary emergency jurisdiction over the proceeding under § 14–13–104(1)(c) because Colorado satisfied the requirements of § 14–13–104(1)(b). This case is therefore distinguishable from *E.P. v. District Court*, 696 P.2d 254 (Colo.1985), and *Brock v. District Court*, 620 P.2d 11 (Colo.1980).

*E.P.* and *Brock* stand for the proposition that, *in the absence of an alternative basis for jurisdiction*, a Colorado court may temporarily modify another state's custody decree in the event of an emergency under § 14–13–104(1)(c). In those cases, we said that a court may exercise *parens patriae* jurisdiction under § 14–13–104(1)(c) only in the gravest of emergencies, and that judicial

relief under that section cannot extend beyond temporary orders which protect the child from the threat of immediate harm. *E.P.*, 696 P.2d at 262; *Brock*, 620 P.2d at 14. We therefore found that continuing jurisdiction was only proper in the state of the initial decree. Central to our holdings in those cases was the fact that neither the custodial parents nor the children were residents of Colorado, but were instead permanent residents of the state of the original custody decree. *E.P.*, 696 P.2d at 263; *Brock*, 620 P.2d at 13–14.

Here, in contrast, both M.G. and K.G. are residents of Colorado. Furthermore, Colorado has jurisdiction as *parens patriae* under the "best interests" provision of the UCCJA, § 14–13–104(1)(b). Colorado is, as a result, not limited to the type of emergent, temporary relief available under § 14–13–104(1)(c).

essentially elevate the father's interest in visitation over the best interests of the child. In that circumstance, the UCCJA's purpose of protecting children from harm would be thwarted, and the very intent of the dependency and neglect provisions of the Children's Code would be nullified. We cannot fathom that the drafters of the UCCJA, or the legislature in enacting the UCCJA, intended such a result. Colorado has an obligation to act in K.G.'s best interests, and to protect her from possible harm, notwithstanding the father's interests in unlimited visitation with her.

### C.

The final issue for our review is whether the PKPA applies in this case, and if so, whether it preempts the UCCJA and divests Colorado of jurisdiction to alter the father's visitation rights pursuant to a petition in dependency and neglect. We conclude, from the plain language of the PKPA, and from the congressional purpose behind the enactment of the PKPA, that its provisions do not apply to proceedings in dependency and neglect.

The PKPA is similar in content to the UCCJA. Generally, the PKPA is an attempt to limit concurrent jurisdiction over child custody disputes, by requiring the states to give full faith and credit to custody decrees from other states. Despite the PKPA's similarity to the UCCJA, there are important differences. For instance, the PKPA places more stringent limitations on a state's jurisdiction to modify the custody decrees of other states. It accomplishes this by specifically continuing the jurisdiction of the state of the initial decree as long as the state "remains the residence of the child or of any contestant." [25] 28 U.S.C. § 1738A(d) (1988).

■ The PKPA thus departs significantly from the UCCJA regarding modification jurisdiction in child custody situations. Moreover, the PKPA is significantly different in another important aspect: the scope of its application to custody proceedings. The UCCJA applies to custody determinations made in "custody proceedings," and the UCCJA's definition of "custody proceeding" expressly includes dependency and neglect proceedings. In contrast, the PKPA provides that the State:

> shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, *any child custody determination* made consistently with the provisions of this section by a court of another State.

28 U.S.C. § 1738A(a) (1988) (emphasis added). The definition of "custody determination" provided by the PKPA conspicuously omits any reference to child dependency and neglect proceedings. Since the PKPA otherwise appears to be closely modeled on the UCCJA, we find that Congress' omission of dependency and neglect proceedings in the definitional section of the PKPA can only mean that Congress made a deliberate choice not to include those proceedings within the coverage of the statute. *See In the Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486, 500–01 (1992); *New Mexico Dep't of Human Servs. v. Avinger*, 104 N.M. 255, 720 P.2d 290, 292 (1986) (both concluding that the PKPA does not apply in dependency and neglect proceedings).

■ Furthermore, the Congressional purpose behind the PKPA demonstrates that the statute was not enacted to thwart a state from protecting the safety of a dependent and neglected child. Rather, the primary

---

**25.** If the PKPA applied to this case, we would be required, under § 1738A(d) and § 1738A(f), to defer to Oklahoma's continuing jurisdiction, since the father continues to reside in Oklahoma. Those subsections provide as follows:

> (d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

. . . .

> (f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—
> (1) it has jurisdiction to make such a child custody determination; and
> (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C. § 1738A(d), (f) (1988).

goal of the PKPA, just as it was with the UCCJA, was to reduce the incentive for parental child-snatching.

In 1968, the drafters of the UCCJA recognized that the effectiveness of the UCCJA's full faith and credit principles would be limited unless all of the states, or at least a majority, adopted the act. *See* Unif. CCJA, Prefatory Note, 9 U.L.A. 115, 118 (1988) (The UCCJA's "full benefits will not be reaped until a large number of states have enacted it."). By the late 1970s, however, not all of the states had adopted the UCCJA, and its effectiveness was therefore limited.[26] After a review of the legislative history of the PKPA, it is evident that Congress was prompted to devise the PKPA as a result of the lack of uniformity in child custody laws between states, and the concomitant increase of child kidnapping cases.[27]

This view finds further support in Congress' "Findings and Declaration of Purpose [of the PKPA]." In that section, Congress recognized the need for uniformity, and for cooperation between states regarding child custody disputes. *See* Parental Kidnaping Prevention Act of 1980, Pub.L. No. 96–611,

§ 7, 94 Stat. 3568, 3568–69 (1980) (codified as amended at 28 U.S.C. § 1738A (1988)). It is clear from the context of those findings and declarations, however, that Congress was endeavoring to make the law uniform between states, in order to change the current state of the law which unwittingly encouraged persons claiming rights to visitation and custody of a child to snatch the child and relitigate the dispute in another forum.

In Colorado's dependency and neglect proceedings under the Children's Code, in contrast, the state's sole purpose for intervening in the child's care is to protect the best interests of the child, and to safeguard the child from further abuse and neglect. The PKPA, like the UCCJA, was not meant to preclude the state from protecting its resident children.

### III.

In conclusion, we find that the juvenile court, acting in the best interests of K.G., had jurisdiction under the UCCJA to limit the father's visitation rights pursuant to a State-initiated petition in dependency and neglect. We also find that the PKPA does not

---

**26.** *See Parental Kidnaping Prevention Act of 1979: Joint Hearing on S. 105 Before the Subcomm. on Criminal Justice of the Senate Judiciary Comm. and the Subcomm. on Child and Human Development of the Senate Labor and Human Resources Comm.,* 96th Cong., 2d Sess. (1980) [hereinafter *PKPA of 1979: Joint Hearing on S. 105].*

[T]he Commissioners on Uniform State Laws have promulgated a uniform act on the reciprocal enforcement·of custodial and visitation decrees. It is an excellent law, but while 39 States have adopted it, Mr. Chairman, 11 have not. Those States have tended to become a sanctuary for kidnaped children.

*Id.* at 40.

**27.** *See Parental Kidnaping Prevention Act of 1979: Addendum to the Joint Hearing on S. 105 Before the Subcomm. on Criminal Justice of the Senate Judiciary Comm. and the Subcomm. on Child and Human Development of the Senate Labor and Human Resources Comm.,* 96th Cong., 2d Sess. (1980).

Should the statute [the PKPA] fail to achieve its primary purpose—the prevention of child snatchings—it nonetheless encourages the parent who has snatched the child to return the child to the person who is entitled to the child's custody or visitation.

*Id.* at 143 (submission of Sen. Wallop, who introduced the bill).

I believe that the problem of parental kidnapping is a serious one in America and warrants the clear attention of the United States Congress. For these reasons, I was pleased to join with Senator Wallop in cosponsoring S. 105....

*Id.* at 135 (statement of Sen. Simpson).

I hope that S. 105 ... will help prevent this kind of self-help [referring to the parental kidnapping of children].

*Id.* at 132 (statement of Sen. Thurmond).

S. 105 would stabilize and strengthen the law to discourage child-snatching, and encourage a stable environment for children who are already traumatized by the divorce of their parents.

*Id.* at 193 (testimony of Sen. Hayakawa).

By providing for full faith and credit for other States['] custody determinations, this section removes the motivation to snatch a child in order to shop for a favorable custody determination in another State.

*PKPA of 1979: Joint Hearing on S. 105,* at 18 (statement of Sen. Durenberger).

*See also* Scott Dickens, *The Parental Kidnaping Prevention Act: Application and Interpretation,* 23 J.Fam.L. 419, 423 (1984–1985) (finding that the PKPA's enactment "seems to have been the result of a sustained increase in the incidence of child snatching cases").

apply to dependency and neglect proceedings, and that the PKPA does not, therefore, preempt state law. Accordingly, we reverse the judgment of the court of appeals, and remand for a reinstatement of the juvenile court's dispositional order.