24CA0568 Peo in Interest of BE 12-12-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0568
Adams County District Court No. 22JV30092
Honorable Emily Leiberman, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of S.E., B.E., and K.E., Children,

and Concerning J.E.,

Appellant,

and

A.S.,

Appellee.

---

JUDGEMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 12, 2024

---

Heidi Miller, County Attorney, Conor Hagerty, Assistant County Attorney, Westminster, Colorado, for Appellee The People

Josi McCauley, Guardian Ad Litem, for S.E.

Josi McCauley, Counsel for Youth, Superior, Colorado, for B.E. and K.E.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado for Appellee A.S.

¶ 1    In this dependency and neglect proceeding, J.E. (father) appeals the juvenile court's judgment allocating parental responsibilities to A.S. (mother). We affirm the judgment.

## I.    Background

¶ 2    The Adams County Human Services Department filed a petition in dependency and neglect regarding then-twelve-year-old B.E., then-eleven-year-old K.E., and then-seven-year-old S.E. (the children). The petition alleged that the Department originally had concerns about S.E.'s inconsistent attendance at school. During the course of the Department's investigation, K.E. disclosed that father had sexually assaulted her. The petition further alleged that the children's stepfather, with whom the children had been living, had a pending dependency and neglect proceeding related to alleged physical and sexual abuse of his child.

¶ 3    The Department removed the children, but it returned them to mother's care about a month later with the understanding that they would not have contact with father or stepfather. However, the children later disclosed that stepfather had been living with them and the Department placed them in foster care. About five months

1

later, the Department again returned the children to mother's care, where they stayed for the remainder of the proceeding.

¶ 4     In the meantime, criminal charges related to the allegations involving K.E. were filed against father.  A criminal protection order prevented all contact between father and K.E.  Initially, the juvenile court also prohibited contact between father and B.E. and S.E.  Eventually, the court approved therapeutic supervised family time between father and B.E. and S.E., which occurred regularly for several months.  However, both B.E. and S.E. expressed an unwillingness to visit father in the months before the allocation of parental responsibilities (APR) hearing.

¶ 5     Mother moved for an APR asking for primary custody of all three children and sole decision-making responsibility.  Mother requested that father have no contact with K.E. and continue having only therapeutic supervised family time with B.E. and S.E. at his own expense.  After holding a hearing and taking evidence, the juvenile court granted mother's motion for an APR.

II.     Allocation of Parental Responsibilities

¶ 6     Father contends that the juvenile court erred when it ordered an APR that allowed only therapeutic supervised contact with B.E.

2

and S.E. because he "had complied with his treatment plan to the extent possible without compromising his criminal case;" "he did not pose a risk to the children;" and "placement with Mother involved significant child protection concerns that Mother had not sufficiently resolved." We disagree.

### A. Standard of Review and Applicable Law

¶ 7    We will not disturb a juvenile court's factual findings when they are supported by the record. *People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010). However, whether the court applied the correct legal standard when making its findings is a question of law that we review de novo. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

¶ 8    The juvenile court has exclusive authority to determine the legal custody of a child who comes within its jurisdiction. *See* § 19-1-104(1)(c), C.R.S. 2024; *L.A.G. v. People in Interest of A.A.G.*, 912 P.2d 1385, 1389 (Colo. 1996). When determining custody or allocating parental responsibilities, the court must consider the legislative purpose of the Children's Code under section 19-1-102, C.R.S. 2024. *People in Interest of C.M.*, 116 P.3d 1278, 1281 (Colo. App. 2005). These purposes include the following:

- securing for each child the care and guidance, preferably in their home, that will best serve the child's welfare and the interests of society;

- preserving and strengthening family ties whenever possible, including improving the home environment;

- removing a child from the custody of their parents only when the child's welfare and safety or the protection of the public would otherwise be endangered, and for the court to proceed with all possible speed to a legal determination that will serve the child's best interests; and

- securing for any child removed from the custody of their parents the necessary care, guidance, and discipline to assist the child in becoming a responsible and productive member of society.

§ 19-1-102(1)(a)-(d).

¶ 9 The purpose of the Children's Code is to protect a child's welfare and safety by providing procedures through which the child's best interests can be served. *L.G. v. People*, 890 P.2d 647, 654 (Colo. 1995); *People in Interest of L.B.*, 254 P.3d 1203, 1208

4

(Colo. App. 2011); *see also L.A.G.*, 912 P.2d at 1391.  As a result, the court must allocate parental responsibilities in accordance with the child's best interests.  *People in Interest of N.G.G.*, 2020 COA 6, ¶ 12; *see L.A.G.*, 912 P.2d at 1391.

### B.    Psychosexual Evaluation

¶ 10    Father argues that when the juvenile court limited his parenting time with B.E. and S.E. to therapeutic supervised family time, it erroneously relied on the fact that he had not completed a psychosexual evaluation, as required by his treatment plan.  He asserts that it was not appropriate for the court to require him to undergo a psychosexual evaluation over his objection in the absence of a criminal conviction and cites to *People in Interest of M.W.*, 2022 COA 72.  We are not persuaded.

¶ 11    First, *M.W.* concerned the appeal of an adjudication, not an APR.  Father provides no authority, nor are we aware of any, requiring the juvenile court to find that a parent had, and complied with, an appropriate treatment plan when deciding the terms of an APR between parents.  Rather, the primary focus is on the child's best interests.  *N.G.G.*, ¶ 12, *L.A.G.*, 912 P.2d at 1391.

¶ 12   Additionally, *M.W.* held that "a parent may not be required, over their objection, to complete an [Sex Offender Management Board (SOMB)] psychosexual evaluation or SOMB therapy as a condition of their treatment plan if the parent has not been convicted of a qualifying sexual offense." *M.W.*, ¶ 56. It noted that "the very structure of SOMB treatment is inconsistent with the core purposes of the Children's Code" which is to "safely reunify children with their parents." *Id.* at ¶ 55. However, *M.W.* went on to explain that "an appropriate treatment plan can — indeed, often should — include psychological counseling focused on the problematic behavior of a parent" and that such treatment "can include evaluation of a parent's sexual proclivities if they interfere with the parent's ability to safely parent their children." *Id.* at ¶ 59.

¶ 13   Aware of these provisions of *M.W.*, the juvenile court crafted father's treatment plan so that it did not require an SOMB offense-specific evaluation, but instead required that he complete a mental health assessment which "will evaluate . . . sexual proclivities" for the safety of the children. It also ordered father to follow through with any recommended treatment from that evaluation.

6

¶ 14    Moreover, father did not object to the requirement that he complete a psychosexual evaluation. Contrary to his assertions on appeal, father refused to complete the evaluation, not because he believed the court exceeded its authority to order it, but because he did not trust that the results would remain confidential. At two hearings occurring after the adoption of his treatment plan, father's counsel advised that father was reluctant to complete the evaluation because he did not want it "leaked" to the prosecution handling his criminal case and that he "did not trust" the parties in the dependency and neglect proceeding to keep the evaluation confidential. Accordingly, and as the juvenile court acknowledged, father's refusal to complete the evaluation was a strategic decision based on the criminal charges he faced, not an objection to the court's authority to order it.

¶ 15    Lastly, when addressing father's failure to complete the evaluation at the APR hearing the court did not "penalize" father, as he suggests in his opening brief. Rather it acknowledged the reality that it had no information about whether father was or was not safe to parent his other children without supervision. It noted that the family time father had with B.E. and S.E. during the proceeding

had been safe because a therapeutic supervisor was present and that those orders would continue to ensure the ongoing safety of the children.

¶ 16    Moreover, the court's determination that mother should have sole decision-making responsibility stemmed from the parties' long-standing inability to cooperate, not because of father's failure to engage in the evaluation.  The record supports this finding, and father does not dispute it.

¶ 17    Based on the foregoing, we cannot conclude that the juvenile court erred when it allocated primary custody of the children to mother and gave her sole decision-making responsibility.

## C.    Mother's Fitness

¶ 18    Father also argues that the juvenile court erred when it ordered the APR because mother had not adequately addressed the domestic violence issues that led to the Department's involvement with the family.  We disagree.

¶ 19    The juvenile court acknowledged the risk of allocating full custody and sole decision-making responsibility to mother given her decision earlier in the proceeding to allow stepfather to be around the children despite a court order prohibiting contact.  However, it

credited the caseworker's testimony and opinion that mother had since cut ties with stepfather and that the children had not had contact with him since they moved back with mother in July 2023. The court also found that mother had completed "a number" of treatments as required by her treatment plan. The record supports the court's findings.

¶ 20 The caseworker, who testified as an expert in social work with an emphasis on child protection, testified that mother completed all of the components of her treatment plan including therapy, a mental health evaluation, a psychological evaluation, supervised parenting time, and working with a life skills professional. She testified that mother's home was appropriate and comfortable and that the children were performing well in school since their return to mother's care. With respect to stepfather, the caseworker testified that she was not aware of any contact between him and the children since the children were returned and explained that she did unannounced visits, drove by mother's home, and talked with the children without mother present. The caseworker further testified that law enforcement had conducted a welfare check in January 2024, but stepfather was not present, and mother and the

children reported that he had not been there.  The caseworker acknowledged that stepfather was an unregistered sex offender and was a threat to the children if he was around, but testified that she had no concerns that he was having contact with the children.

¶ 21     Mother also testified that stepfather was "no longer in [her] life."  She agreed that she might not have had concerns about stepfather in the past, but she "took accountability," had made changes, and had done everything she needed to do to keep the children safe.

¶ 22     Father argues that mother had a history of exposing the children to harm by way of stepfather and had violated court orders prohibiting contact.  And he asserts that although mother testified that she had distanced herself from stepfather, her history revealed a "tendency to remain in harmful relationships and a longstanding pattern of dissembling to cover them up."  But father's arguments ask us to reweigh mother's credibility and find in father's favor, which we cannot do.  *A.J.L.*, 243 P.3d at 256 (court of appeals may not substitute its opinion for that of the fact finder regarding credibility of witnesses, and the weight, sufficiency, and probative value of the evidence).

¶ 23    Accordingly, the juvenile court did not err when it granted an

APR to mother.

III.    Disposition

¶ 24    The judgment is affirmed.

JUDGE GROVE and JUDGE LUM concur.