OPINION OF THE COURT
Ciparick, J.
In this extraordinary case, a Family Court Act article 10 child protective proceeding, petitioner Monroe County Department of Social Services (DSS) alleges that respondent Patricia Anri P., a Florida resident, has neglected her two children by her failure and inability to provide a minimum degree of care causing impairment of their emotional health and well-being and a substantial risk of serious future harm. The children, Say eh (now 18)[1] and Arash (now 14), have, for the past 8½ years, been living with their father, in Rochester, New York.
*311 The issues presented are (1) whether the Federal Parental Kidnaping Prevention Act (PKPA) (28 USC § 1738A) preempts the Family Court from taking any action in this case under article 10 of the Family Court Act; (2) whether there is support for allegations that respondent has engaged in acts or omissions constituting neglect within the meaning of section 1012 of the Family Court Act which would justify petitioner’s exercise of its child protective responsibility; and (3) whether acts by respondent authorize the assertion of personal jurisdiction by Family Court of the State of New York. We hold that Family Court does have subject-matter jurisdiction over this proceeding and may properly assert personal jurisdiction over respondent. The matter was improperly dismissed on jurisdictional grounds, without reaching the merits, and accordingly should be remitted to Family Court for further proceedings.
I. FACTS AND PROCEDURAL BACKGROUND
Ahmad R and Patricia Ann P. were married in Florida in December 1980. Three children were born of the union, Sayeh in October 1979, Sara in October 1981, and Arash in July 1983. A judgment of divorce was granted by the Florida Circuit Court in January 1986, with respondent designated the primary custodial parent. The father relocated to Rochester. In September 1988, Raymond Wike, described in the record as a former boyfriend or acquaintance of respondent, abducted Sayeh and Sara from their bedroom while respondent slept. Wike attacked the two girls, raping and repeatedly stabbing them. Sara was murdered, and Sayeh survived only by feigning death.
In 1989, the Florida court modified its 1986 custody order by making the father the primary custodial parent. Respondent was granted liberal summer and Christmas visitation rights. In so doing, the Florida court stressed the children’s need for counseling in the wake of their sister’s murder and its finding that the father was the “most capable of providing the daily needs as well as the extraordinary psychological needs of the children” (emphasis supplied). Pursuant to that order, Sayeh and Arash were relocated to Rochester to live with their father, stepmother and children from the second marriage.
For all of the more than eight years since then until the present time, Sayeh and Arash have been New York domicili *312 aries. Over the years, their lives appear to have become completely integrated into their new family unit in Rochester where they have enjoyed the love, guidance and emotional support of their family on a daily basis.
In contrast with the safe and nurturing environment which the children apparently have enjoyed in their Rochester home, there are corroborated allegations that respondent repeatedly verbally and physically abused the children during their visits to Florida.
In 1995, the children expressed their unwillingness to visit their mother in Florida, indicating that they no longer wished to see her. In December of that year, respondent traveled to Rochester to attempt to enforce her rights to visitation through temporary custody of the children in Florida over their Christmas vacation. Respondent went to the children’s home accompanied by a police officer and also allegedly by an unidentified male companion, but was rebuffed and informed that the children did not want to see her.
Respondent then sought enforcement of her visitation rights by means of contempt proceedings against her former husband in the Florida court. In March 1997, following repeated contempt orders against him resulting from a refusal to deliver the children to Florida, the Florida court modified its 1989 custody order, granting primary custody to respondent. An unsuccessful attempt was made in New York to modify the Florida court order which respondent aggressively defended, seeking, affirmatively by order to show cause and subsequently filed attorney’s affidavit, enforcement of her rights as per the Florida orders to temporary and then permanent custody {see, Matter of Mott v Patricia Ann R., 91 NY2d 856 [decided today]).
In April 1997, petitioner DSS filed the instant petition in Family Court, alleging that, as a result of the prior trauma, the children have weakened psychological functioning and diagnosed serious psychological and emotional pathologies, which would be further severely aggravated by respondent’s efforts to obtain temporary and permanent custody.
Respondent moved to dismiss the petition and after a hearing on the issue of jurisdiction, Family Court granted her motion. The court held that (1) it lacked personal jurisdiction over respondent, insomuch as the acts alleged by DSS, even if established, did not constitute neglect within New York necessary to support personal jurisdiction under Family Court Act § 1036 (c); (2) the emergency jurisdiction provisions of the *313 Uniform Child Custody Jurisdiction Act (UCCJA) (Domestic Relations Law article 5-a) were inapplicable; and (3) the Federal PKPA precluded the court from modifying the Florida court’s custody determination.
Reaching only the issue of personal jurisdiction, the Appellate Division affirmed. The Court reasoned that, by arguing that “the emotional consequences in New York of respondent’s attempt to enforce otherwise valid Florida orders of visitation and custody constitute neglect occurring within New York,” petitioner in effect sought a
“holding that a valid visitation and custody order of one State is the basis for a neglect finding in another State. * * * Such a holding would contravene the strong public policy embodied in the [UCCJA] and [PKPA] to avoid conflicting determinations in interstate custody disputes and would encourage conversion of private custody disputes into child protective proceedings.” (239 AD2d 959, 960.)
We granted leave to appeal and now reverse and remit to Family Court for further proceedings.
II. ANALYSIS
A. PKPA Preemption
Although Florida has chosen to retain jurisdiction over any custody matters involving respondent mother and the father of the children, the instant proceeding is not an attempt to modify the foreign custody determination but, rather, a valid exercise of lawful authority by an independent statutorily created governmental agency to intervene on behalf of two New York children at risk. In its role as parens patriae, New York is under a powerful duty to protect its domiciliaries from harm (see, e.g., NY Const, art XVII, § 3). Clearly in the context of a child protective proceeding, the State of New York is best placed to carry out this most important duty in protecting its own infant residents.
A child protective proceeding under article 10 is specifically designed to protect children from injury, abuse or mistreatment, and to help safeguard their physical, mental and emotional well-being (see, Family Ct Act § 1011). Thus, because the parties involved and the relief sought in this child protective proceeding are quite distinct from those of a custody dispute, this child protective proceeding is not a “custody determination” within the meaning of the PKPA or New York’s UCCJA (see, L.G. v People, 890 P2d 647 [Colo]; In re Interest of L.W., 241 Neb 84, 486 NW2d 486; State ex rel. Department of *314 Human Servs. v Avinger, 104 NM 255, 720 P2d 290; see also, White v Blake, 859 SW2d 551 [Tex App]; cf., Matter of Mott v Patricia Ann R., 91 NY2d 856, supra). We further note New York UCCJA’s express exclusion of child protective proceedings from its definition of “custody proceeding” (see, Domestic Relations Law § 75-c [3]).
Here, DSS is acting independently pursuant to its statutory mandate, having investigated reports of alleged abuse and mistreatment. There is absolutely no evidence that DSS is acting on behalf of the children’s father. On the contrary, there is independent clinical corroboration of the harmful effects Sayeh and Arash would suffer if removed from their home. Furthermore, New York State has a compelling interest in assuring the safety and well-being of its domiciliaries. As such, we conclude that Family Court erred in viewing this article 10 proceeding as an attempt to modify the Florida court’s custody determination as between the parents, notwithstanding that court’s retention of continuing jurisdiction over its prior custody order.
B. Authority of Monroe County DSS to Bring This Child Protective Proceeding
Respondent challenges the authority of DSS to bring this proceeding on the grounds that, as a matter of law, a parent’s use of the New York courts and law enforcement authorities to enforce judicially granted rights of temporary or permanent custody cannot constitute neglect within the State (see, Family Ct Act § 1036 [c]). We disagree. While it is true that respondent has a legal right to seek enforcement of valid court orders, her disregard of her children’s special vulnerabilities in attempting to enforce her rights of temporary or permanent custody could nevertheless give rise to a finding of neglect within the meaning of the Family Court Act.
As defined in the Family Court Act,
“ ‘Impairment of emotional health’ and ‘impairment of mental or emotional condition’ includes a state of substantially diminished psychological or intellectual functioning * * * [and] must be clearly attributable to the unwillingness * * * of the respondent to exercise a minimum degree of care toward the child” (Family Ct Act § 1012 [h] [emphasis supplied]; see also, Family Ct Act § 1012 [f] [i] [defining a neglected child as one whose “physical, mental or emotional condition has been impaired *315 or is in imminent danger of becoming impaired as a result of the failure of (a) parent * * * to exercise a minimum degree of care” (emphasis supplied)]).
It is settled law that a child’s frailties, weaknesses and special needs must be taken into account when they exist. Thus, the “minimum standard or degree of care” must, of necessity, take into account the special vulnerabilities of the child. For a child with such special vulnerabilities, the minimum standard of care will of necessity be an expansive standard (see, Matter of Milland, 146 Misc 2d 1, 6; see also, Matter of Hofbauer, 47 NY2d 648 [“minimum degree of care” cannot be judged in a vacuum free from external influences, but rather each case must be decided on its own particular facts]; Matter of Jose Y., 177 AD2d 580; Matter of New York City Dept. of Social Servs. [Anna Marie A.] v Elena A., 194 AD2d 608). A parent fails to exercise a minimum degree of care in not responding to the special needs of a child, even when those needs may not seriously implicate general physical health (see, Matter of Sampson, 37 AD2d 668, 669, affd 29 NY2d 900; Matter of Ray, 95 Misc 2d 1026, 1029). Parents may not ignore the fact that their conduct is impairing their children’s emotional health (see, Matter of Theresa CC., 178 AD2d 687, 688-689).
Similarly, other State high courts have recognized that the “minimum degree of care” must take into consideration the special vulnerabilities of the child in question (see, e.g., In Interest of L.J., 436 NW2d 558, 561 [ND] [“It can hardly be questioned that some children require more care and attention and skill * * * than do others. The requisite care and control called for by a minimum standard of parenting must necessarily fluctuate with the kind of children being parented. There is no absolute standard”]; People in Interest of D.K., 245 NW2d 644 [SD]; see also, Matter of Scott G., 124 AD2d 928 [definition of neglect sufficiently elastic to embrace situations in which a parent allows the child to become impaired]).
In the instant case, we find it significant that an independent mental health expert, a child psychologist retained by DSS and not affiliated with either parent, after examining Sayeh and Arash, diagnosed them as suffering from clinical disorders stemming from their earlier trauma and predicted that their mental health might be worsened if respondent succeeded in immediately enforcing her visitation and custodial rights.
Specifically, with regard to Sayeh, the child psychologist found that:
*316 “nothing [could] be more terrifying and traumatic for Sayeh tha[n] to return her to the place where her sister was raped and murdered and where she was raped, physically assaulted and left for dead.”
His prognosis on the effect of the success of respondent’s efforts was:
“A major depression would probably be one component of her condition if this occurs. * * * This further suggests that if she experiences a personality disorganization as a result of being confronted with overwhelming life stress, that the disorganization would be massive.”
Similarly, with respect to Arash, the psychologist found that:
“Arash also appears to have more anger than has been previously evident, with that anger serving to mask his fear of his mother and her potential actions. * * * These kinds of feelings [can] provide the psychological base for emotional trauma.”
As respondent’s efforts for temporary or permanent custody in Florida intensified, he wrote: “[Arash] is now more * * * disturbed * * * [T]he consequences are even more grave.”
The independent child psychologist’s clinical prediction of the effects that enforcement of respondent’s visitation and custodial rights would have on the children cannot be ignored. It supports the allegation that, given these exceptional circumstances and special vulnerabilities, the children would be in imminent danger of severe emotional harm as a result of the mother’s attempt to force their precipitous return to Florida without benefit of any preliminary ameliorative services (see, Matter of Milland, supra; see also, In Interest of L.J., supra). Surely, there is evidence to support a claim that respondent’s conduct threatens to induce a “state of substantially diminished psychological * * * functioning” in the children (Family Ct Act § 1012 [h]). There is also evidence to support the allegation that the threatened “impairment of emotional health” (id.) would be “clearly attributable to the unwillingness” (id. [emphasis supplied]) of respondent to recognize and take into account the special vulnerabilities of her children.
Critical is the fact, uncontested in this record, that the children’s special vulnerabilities resulted from the unique, devastating trauma they experienced earlier while in their mother’s care, and that custody was then transferred upon an *317 assessment of her incapability to provide adequate care for these especially needy children. In this situation, where enforcement of respondent’s judicially granted rights to temporary or permanent custody would, in the sound judgment of qualified independently and otherwise retained clinicians, cause severe emotional harm, our child protective laws are not impotent to protect these children through the invocation of an article 10 proceeding.
We note also that although respondent unquestionably had a legal right to seek to enforce her Florida visitation rights, she had an obligation to pursue those rights in a responsible way. Given the family’s history, a responsible adult would have considered the possibility that an abrupt resumption of visitation with respondent in Florida — and a forced return to the place where the harrowing trauma-producing events occurred — might have a devastating effect on the children’s psychological well-being. Yet, respondent chose to insist upon just such a sudden shift of temporary custody instead of taking a gradual approach by initially seeking short, supervised visits, coupled with family counseling for all of the principals, as a means of building a positive relationship and restoring the children’s trust to whatever extent was possible. Undoubtedly, had respondent chosen such a gradual course, New York courts and social services agencies would have been willing to provide the necessary support and facilities. Respondent’s contrary decision to demand an immediate delivery of the children without regard to their need for preparatory counseling and related services could well be found to represent precisely the kind of failure “to exercise a minimum degree of care” that our neglect statute contemplates (see, Family Ct Act § 1012 [f] [i]).
Thus, contrary to the dissenters’ suggestion that this is merely a case about respondent seeking contact by way of visitation with her children in an environment secure to the children, the instant determination that the allegations of neglect are valid would be predicated more accurately upon respondent’s heedless and precipitous efforts to enforce visitation rights in Florida and, when she was unsuccessful, threatening the children with the ultimate sanction of forced immediate relocation to Florida in her sole custody.[2]
*318 Surely, on the basis of the potential harm clinically identified in this record, it cannot be said here that the allegations of neglect are insubstantial or that the exercise of child protective jurisdiction is merely a parental device to overturn a custody determination validly made by a court of another State, and we are confident that the New York courts and child protective agencies will be vigilant against any such abuse of our protective laws in the future. In the latter regard, it is especially significant that the Family Court Act does not permit the initiation of article 10 proceedings by anyone other than a child protective agency, except with prior court authorization (see, Family Ct Act § 1032; see also, Family Ct Act § 1012 [i]; Matter of Weber v Stony Brook Hosp., 60 NY2d 208, 212, cert denied 464 US 1026).
C. Personal Jurisdiction
Although the courts below sustained the dismissal of the instant petition on the grounds of lack of personal jurisdiction, we disagree and hold that the instant allegations are sufficient to satisfy the requirements of Family Court Act § 1036 (c). That section provides, in pertinent part,
“In cases involving either abuse or neglect, the court may send process without the state in the same manner and with the same effect as process sent within the state in the exercise of personal jurisdiction over any person subject to the jurisdiction of the court under [CPLR 301 or 302], notwithstanding that such person is not a resident or domiciliary of the state, where the allegedly abused or neglected child resides or is domiciled within the state and the alleged abuse or neglect occurred within the state” (Family Ct Act § 1036 [c] [emphasis supplied]).
It is undisputed that Sayeh and Arash are New York domiciliaries and, as noted above, petitioner has sufficiently supported its allegations that the acts of neglect occurred within the State.
Notably, here, this conduct (that is, acts in New York threatening the children with successful enforcement of her right to custody over them in Florida) brings respondent within the reach of New York’s long-arm statute. Moreover, there is sufficient evidence that respondent has “ ‘engaged in some purposeful activity [here] * * * in connection with the matter in suit’ ” (Parke-Bernet Galleries v Franklyn, 26 NY2d 13, 16 *319 [quoting Longines-Wittnauer Watch Co. v Barnes & Reinecke, 15 NY2d 443, 457]; see also, McGee v International Life Ins. Co., 355 US 220, 223). Use of the New York courts is a traditional justification for the exercise of personal jurisdiction over a nonresident (see, Rios v Altamont Farms, 64 NY2d 792, 794; Lynch v Austin, 96 AD2d 196).
Respondent has repeatedly invoked the aid and protection of our courts, seeking affirmative relief here in New York in cross-moving, by order to show cause dated July 3, 1996, and subsequently in an attorney’s affidavit of July 19, 1996, to enforce the Florida court orders in the related case of Matter of Mott v Patricia Ann R. (supra). Additionally, when respondent attempted to enforce visitation with the children in 1995, she enlisted the aid of local police. Based on the foregoing, respondent availed herself not only of the benefits of this State’s courts but also of the support of this State’s law enforcement system. Thus, the conclusion is inescapable that, under these particular circumstances, respondent deliberately and affirmatively sought the protection of this State’s laws, and thereby rendered herself amenable to our general long-arm jurisdiction (see, Kazlow & Kazlow v Goodman & Co., 92 Misc 2d 1084, 1086; see also, Kreutter v McFadden Oil Corp., 71 NY2d 460, 466-467; Burger King Corp. v Rudzewicz, 471 US 462, 477).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the matter remitted to Family Court for further proceedings in accordance with this opinion.

. Although Sayeh is now 18, Family Court is permitted to exercise jurisdiction over her regarding the alleged acts of neglect which occurred prior to her 18th birthday with her consent (see, Family Ct Act § 1055 [e]). Moreover, her brother’s matter remains properly before this Court, and evidence of *311 abuse or neglect as to the older sibling may be used in a child protective proceeding as to younger siblings still subject to the court’s jurisdiction (see, Family Ct Act § 1046 [a] [i]).

. We do not condone any role the father may have played in thwarting visitation. This is not the proper forum for resolving factual differences regarding the conduct of either party. All we determine here are the law issues regarding preemption and jurisdiction.