The PEOPLE of the State of Colorado, Petitioner–Appellee,

In the Interest of L.A.N., a/k/a L.A.C., a Child,

and

Concerning L.M.B., Respondent–Appellant.

No. 10CA2408.

Colorado Court of Appeals, Div. II.

July 7, 2011.

David R. Fine, City Attorney, Laura Grzetic Eibsen, Assistant City Attorney, Denver, Colorado, for Petitioner–Appellee.

Amy J. Packer, Guardian Ad Litem.

Susan P. Halloran, Littleton, Colorado, for Respondent–Appellant.

Opinion by Judge WEBB.

In this dependency and neglect proceeding, L.M.B. (mother) appeals from the judgment terminating her parent-child legal relationship with L.A.N., also known as L.A.C. (the child). Mother contends, and we agree, that the judgment must be vacated because the notice requirements of the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901–1963 (the ICWA), were not met. Therefore, we vacate the judgment and remand for further inquiry and proper notice as provided in this opinion. However, because the child may not be eligible for tribal membership, or even if she is, the case may not be transferred to a tribal court, we also address mother's contention that the court erred by denying her request for production of the file of the child's therapist. We further conclude that the court erred in denying mother's request, and that a remand is needed to address this issue.

## I. Introduction

The Denver Department of Human Services (DDHS) received a referral regarding L.A.N., then seven years old, on December 9, 2008. Staff at Children's Hospital reported that the child had been brought to the hospital because of out-of-control behavior and suicidal statements; mother had refused their treatment recommendations; and, when told that transfer of the child to a mental health facility was being considered, she had attempted to flee with the child.

A judge's hold was placed on the child, and on December 12, DDHS filed a petition in dependency and neglect. Upon release from the hospital, the child was placed in the custody of her maternal aunt. The aunt hired Kris Newland (the therapist) to provide therapy for the child. The therapist began working with the child in April 2009 and continued to do so after the child was placed in the care of her maternal grandparents.

Based on mother's no fault admission, on March 11, 2009, the child was adjudicated dependent and neglected as to mother. A treatment plan was adopted for mother a month later. Among other things, it required mother to secure and maintain legal employment; secure safe housing for herself and the child; show her understanding of the needs of the child; participate in parenting classes and apply the information learned during visits with the child; undergo a mental health evaluation and demonstrate her ability to meet the child's needs as well as her own; and obtain anger management treatment.

Mother worked on her treatment plan for almost two years. In November 2010, the court found that mother had not successfully achieved many of the plan's objectives: she had not achieved stable housing and an adequate income; she had completed parenting classes but had not shown appropriate parenting on a regular basis during her visits with the child; she had not put the child's needs ahead of her own; and, although she had obtained a mental health evaluation and participated in individual therapy, she had not overcome her anger management problem. After concluding that mother was not fit to parent the child and not likely to become fit within a reasonable time, the court terminated her parental rights.

## II. ICWA Compliance

■ Mother first contends the juvenile court erred in failing to ensure that the notice requirements of the ICWA were met. She points out the record does not show that any notice was sent to the Cherokee Nation of Oklahoma after the court was informed that she was affiliated with that tribe, or that any determination was made as to whether the child's biological father, S.J.C., had any Indian heritage. The judgment must be vacated because of these deficiencies.

■ The ICWA was enacted because of a concern about the involuntary separation of "alarming numbers" of Indian children from their families for placement in non-Indian homes or institutions. *B.H. v. People in Interest of X.H.*, 138 P.3d 299, 301 (Colo. 2006) (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989)). To ensure that Indian children will be placed within the Indian community whenever possible, the ICWA provides that, if the state knows or has reason to believe that an Indian child is involved in a proceeding that may result in placing the child in foster care or terminating parental rights, the state must provide notice to the child's tribe of the pending proceedings. 25 U.S.C. § 1912(a).

Section 19–1–126, C.R.S.2010, sets forth procedures for compliance with the ICWA in dependency and neglect (D & N) actions and other proceedings involving the custody of children in Colorado courts. Under section 19–1–126(1)(a)–(b), C.R.S.2010, the petitioning or filing party must "[m]ake continuing inquiries to determine whether the child who is the subject of the proceeding is an Indian child" and, if so, determine the identity of the child's tribe and provide notice of the proceeding to that tribe. Under section 19–1–126(2), C.R.S.2010, if the initial pleading in such a case does not disclose whether the child who is the subject of the proceeding is an Indian child, the court must inquire of the parties at the first hearing whether the child is an Indian child and, if so, whether the parties have complied with the procedural requirements of the ICWA.

■ Tribal membership is not defined in the ICWA; rather, membership for the purposes of the ICWA is left to the control of each individual tribe. Thus, "sufficiently reliable information of virtually any criteria upon which membership might be based must be considered adequate to trigger the notice provisions of the Act." *B.H.*, 138 P.3d at 303–04.

Whether the notice requirements of the ICWA were satisfied is a question of law, which this court reviews de novo. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App.2009).

Here, mother first appeared in court on December 15, 2008. As required by section 19-1-126(2), the magistrate inquired whether she was registered or eligible to be registered in a federally recognized Indian tribe. Mother explained that her family did not have "the roll number" needed to establish membership in the Cherokee Nation, but the tribe had been working with members of her family to try to find the roll number. Based on mother's report, the magistrate determined, "[W]e need to send notice to the Cherokee Nation in Oklahoma." However, DDHS did not comply with the magistrate's order.

Instead, in August 2009—eight months after the magistrate directed that notice should be given—DDHS filed a motion requesting a finding that the case was not subject to the ICWA. The motion was supported by the affidavit of a caseworker stating that in June, he had discussed the question of mother's Indian heritage with the maternal grandparents, who told him, "If we have any Indian heritage it would be at a very small percentage, no one in our family was ever registered with any tribe." Although the record does not include a ruling on this motion, DDHS never gave notice to the Cherokee Nation. Further, the record does not indicate that DDHS inquired about possible Indian heritage among the child's paternal relatives after father was located, or that the court ever inquired whether the child might be an Indian child based on paternal Indian heritage.

We reject DDHS's assertion that mother did not provide sufficient information to trigger the notice requirements of the ICWA. If mother's family succeeded in locating "the roll number" which would establish their eligibility for membership in the tribe, the criteria for membership in the Cherokee Nation might be satisfied for the child as well. Thus, because this information was sufficient to trigger the notice requirements of the ICWA, we conclude that the court erred in failing to confirm that notice was given to the

Cherokee Nation, and in failing to ensure that proper inquiry was made as to possible Indian heritage among the child's paternal relatives.

Accordingly, we further conclude that the judgment must be vacated and the case remanded so that notice may be given to the Cherokee Nation and an inquiry may be made among the child's paternal relatives as to possible Indian heritage on that side of her family. If the child's paternal relatives provide information sufficient to trigger the notice provisions of the ICWA with respect to other tribes, those tribes must be given notice as well.

### III. Request for Production of Therapist's File

Mother next contends the juvenile court erred when it denied her request for production of the therapist's file. Reviewing for an abuse of discretion, *see, e.g., In re Marriage of Amich,* 192 P.3d 422, 424 (Colo.App.2007), we agree that she was entitled to at least a portion of this file, and therefore conclude that further proceedings are needed on this issue.

### A. Background

The therapist continued to treat the child through the termination hearing that took place in October 2010, at which she testified as a witness for DDHS. During that time, the DDHS caseworker provided her with background information regarding the events that had brought the child to the attention of the state. In turn, she reported disclosures made by the child to the caseworker and the guardian ad litem (GAL). She also participated in a DDHS team decision-making meeting.

In June 2009, DDHS told the court that the therapist had verbally reported her opposition to returning the child to mother's care. In July 2010, the court asked her for a "general update" and sought her opinion whether visitation should be increased and whether visits should be unsupervised. She provided information on the child's progress in therapy and opined that visitation should not be increased.

On February 18, 2010, after having worked with the child for approximately ten months, the therapist submitted a letter to the GAL to "share some of [her] observations" regarding the case. Although she did not explicitly recommend against reuniting the child with mother, she described a number of "concerns" that she had about the child's welfare were that to occur. She described the child's slow progress in therapy and expressed doubt about the ability of mother and D.M.B. (stepfather) to meet the child's needs. She quoted statements the child made during therapy that the child did not want to go home to mother. She also repeated the child's description of incidents that had occurred while the child was in mother's care, as well as the child's generally negative feelings about living with mother and stepfather.

The GAL provided the therapist's letter to the court and each of the other parties. The court had not authorized her to do so, nor had the court, at that time, ruled on privilege waiver. The GAL did not attempt to reserve the privilege between the child and the therapist.

In June 2010, mother's attorney subpoenaed the therapist for a deposition and to produce her "entire case file," including notes, documents, and video and audio records of treatments. The therapist moved to quash the subpoena. As pertinent here, she argued that the subpoena sought information and documents that were privileged under section 13–90–107(1)(g), C.R.S.2010, which prohibits the examination of a psychotherapist without the consent of the client as to communications made or advice given during the course of the professional employment. Mother responded that any privilege was implicitly waived because the mental condition of the privilege holder (the child) was at issue, the child's progress in therapy was "outcome-determinative" of mother's parental rights, and access to the therapist's records was necessary to determine the basis for the information, opinions, and conclusions set forth in the therapist's letter to the GAL.

At a hearing on the motion to quash, after the therapist and mother presented their arguments, the court invited DDHS and the GAL to state their positions. The GAL, with the support of DDHS, expressed concern that a "problem" might result if the child realized that everything she had said to the therapist could be disclosed to mother.

The court then found that the child was not competent to waive her own privilege; mother could not waive it because in opposing termination of her parental rights, her interests could be adverse to those of the child, which she does not dispute on appeal; and neither the DDHS caseworker nor the GAL was in a position to waive it, even if so inclined. Nevertheless, the court concluded that by allowing and encouraging the therapist to make statements in court to update the court on the child's therapy, it had authorized a limited waiver of the privilege. Without addressing either the GAL's circulation of the letter or the disclosure of information from the therapist by DDHS, the court ordered the therapist to participate in a deposition (or, alternatively, a "chat" with mother's attorney), but not to produce any notes, videotapes, or other records.

After deposing the therapist but before the termination hearing, mother again requested that the court order the release of the therapist's file. Citing CRE 612, she argued that the therapist's notes should be made available because the therapist had reviewed them in preparation for her deposition. She also argued that because the therapist testified to the child's positive comments about mother that were not in the letter, the file should be produced to show the dates and context of these communications. At the termination hearing, mother renewed her request for the therapist's file. However, the juvenile court reaffirmed its earlier order that disclosure of the therapist's files was not required under the limited waiver of that privilege which had been made to allow the therapist to update the parties, the other professionals, and the court regarding the child's progress in therapy.

DDHS then called the therapist as its witness. The GAL also asked her questions. The therapist expressed strong doubts about mother's ability to parent the child successfully. She testified that the child had been harmed by the anger and instability in mother's home, and that the child had made state-

ments during therapy indicating that she did not want to be reunited with mother.

### B. Privilege and Waiver

Mother contends the juvenile court erred by depriving her of a fundamentally fair procedure when it received information from the therapist but refused to order production of the therapist's file. She argues that the privilege was waived when the child's mental health was placed in issue by the filing of the D & N action; because the child's rehabilitation "formed the crux of this case," she should have been given access to information about what had gone on in therapy; and the child had impliedly waived the privilege when she told the therapist that she did not want to go home to mother. We conclude that because DDHS and the GAL disclosed privileged information which was adverse to mother in seeking to terminate her parental rights, the privilege was waived, and under these circumstances totally denying mother access to the therapist's file deprived her of a fundamentally fair opportunity to protect those rights. Therefore, the trial court abused its discretion.

■ Section 13–90–107(1)(g) prohibits disclosure of privileged communications between a psychotherapist and the client. When a mental health professional has been retained to assist in litigation, disclosure of privileged information by the mental health professional to the privilege holder's attorney does not waive the privilege because the mental health professional serves as the agent of the attorney. *See Lanari v. People,* 827 P.2d 495, 499 (Colo.1992) (citing *Miller v. Dist. Court,* 737 P.2d 834, 837–38 (Colo.1987) (where psychiatrist was retained by client's counsel to assist in preparing his defense, client's statements to the psychiatrist were to be deemed statements to his attorney for purposes of the attorney-client privilege)).

However, the privilege is waived when the privilege holder, by words or conduct, has expressly or impliedly forsaken the holder's claim of confidentiality with respect to the information in question. *Clark v. Dist. Court,* 668 P.2d 3, 8 (Colo.1983). For example, an implied waiver was found when the plaintiffs in a personal injury action requested dam-

ages for mental suffering and related costs of psychiatric care. *See Bond v. Dist. Court,* 682 P.2d 33, 38 (Colo.1984); *see also Mountain States Tel. & Tel. Co. v. DiFede,* 780 P.2d 533, 544 (Colo.1989) (where a party alleges reasonable reliance on her attorney's statement as an element of claim or defense, to allow the party simultaneously to retain the attorney-client privilege with respect to the communication would be unfair). And in *People in Interest of E.H.,* 837 P.2d 284, 291–92 (Colo.App.1992), the division held that a mother waived the privilege that had initially protected her communications with a psychologist retained by her attorney to assist in preparing for a termination of parental rights hearing when she called the psychologist to testify and did not request any protective or limiting order concerning the nature or extent of the testimony.

Here, the parties assume, and we agree, that some information in the therapist's file, which is not part of the record, would be privileged. Hence, our concern is whether waiver broader than that determined by the juvenile court occurred based on conduct of a party having authority to do so.

Mother argues that the filing of this D & N action placed the child's mental condition at issue, and therefore impliedly waived the psychotherapist-client privilege. To the extent that this argument could be construed as asserting that the filing of *every* D & N action raises issues concerning the mental condition of each child who is a subject of such an action, and thereby automatically waives the privilege, we reject it as overly inclusive.

■ While many children may suffer mental or emotional stress as a result of the parental abuse or neglect that justifies state intervention, we cannot conclude that such stress occurs in all D & N cases. For example, some children are separated from their parents at birth. Further, in the tort context, merely referring to mental suffering in the complaint does not alone constitute an implied waiver of the psychotherapist-client privilege. *See, e.g., Johnson v. Trujillo,* 977 P.2d 152, 157 (Colo.1999) (plaintiff made no independent tort claims for either intentional

or negligent infliction of emotional distress and sought no compensation for the expenses incurred in obtaining counseling).

Mother's argument could be read more narrowly: the filing of this particular D & N action waived the privilege because it alleged that immediately before the child was removed from mother's care, the child had been hospitalized for out-of-control, aggressive behavior and suicidal statements. This argument is more consistent with Colorado law on waiver, *see Bond*, 682 P.2d 33, but it ignores the two different purposes for filing a D & N action.

On the one hand, because the proceeding may result in terminating a parent's legal relationship with a child, the court must consider the child's mental and emotional status, the respondent parent's role in causing any mental or emotional problems of the child, and the likelihood that the child will suffer further harm if returned to that parent's care. *See* § 19–3–604(3), C.R.S.2010 (in considering the termination of the parent-child legal relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child, and shall order, if necessary, an evaluation of the child's physical, mental, and emotional conditions); § 19–3–604(2), C.R.S.2010 (a parent may be deemed unfit, for the purpose of terminating parental rights, if the court finds that the parent is unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions). A mental health evaluation could be probative of these considerations.

■ On the other hand, during the proceeding, the state, acting as the child's protector, assumes responsibility for the child and undertakes to ensure the child's safety and protect his or her best interests. *See L.G. v. People*, 890 P.2d 647, 654 (Colo.1995) (under the Children's Code, the State of Colorado acts as *parens patriae*—sovereign

guardian—to safeguard the interests of vulnerable children within the state; in keeping with this objective, the paramount concern in a D & N action is to protect the child from any further harm as the result of abuse or neglect). Where, as here, the child is in psychological distress, the state may decide that psychotherapy is needed.

■ Thus, in a D & N proceeding, a therapist could perform either of two different functions: first, evaluating a troubled child and providing information to the parties and the court; and, second, treating such a child but not disclosing anything about the therapy. The former role does not create a problem unique to D & N proceedings because, in general, where a therapist evaluates a party for the purpose of providing an opinion in pending litigation, the relationship between the therapist and that party is not privileged. *Cf. B.B. v. People*, 785 P.2d 132, 140 (Colo. 1990). As to the latter role, however, if the therapist provides needed treatment, then finding an implied waiver based solely on the filing of a petition that expressly puts the child's mental health in issue creates a dilemma. Ongoing treatment may be compromised if the confidentiality of the therapist-client relationship cannot be maintained; but unless the child's parents agree to a voluntary treatment plan, the state must file a petition and prove that the child is dependent or neglected to gain the legal authority to provide the child with treatment.

■ Here, we need not resolve this dilemma by deciding whether such a petition impliedly waives the privilege. Instead, we conclude that DDHS and the GAL expressly waived the privilege because both of them obtained privileged information from the therapist and then disclosed that information to the court in advocating to terminate mother's parental rights. This conduct would waive the privilege, *see People in the Interest of E.H.*, 837 P.2d 284, subject only to whether at least one of them had the authority to do so.[1]

---

1. The juvenile court concluded that due to her tender years, the child could not waive the privilege, and we agree. If a child is not competent to act on her own behalf, then one who has been granted the authority to act for her may waive the privilege that would otherwise apply to the child's communications with her psychologist. *See, e.g., People v. Wittrein*, 221 P.3d 1076, 1083

■ Before addressing the authority of DDHS and the GAL, we consider the juvenile court's assumption that it could waive the privilege for the child, at least to a limited extent. Of course, the court can rule on privilege issues raised by a party. But we are unaware of any authority in Colorado allowing a court to act as or on behalf of a privilege holder. Further, doing so would create a potential conflict because the court could be required to rule on the scope of the waiver created by its own conduct.

■ We recognize that judicial authorization for limited disclosure of privileged information, without otherwise waiving the privilege, could assist in identifying the resolution that furthers the child's best interests.[2] But in Colorado, the psychotherapist-client privilege applies to any communication made by the client to the psychotherapist "in the course of professional employment." § 13–90–107(1)(g). The statute does not provide for even limited disclosure. Hence, where a psychotherapist has been employed to provide therapy to a child, we construe section 13–90–107(1)(g) to prohibit disclosure of all communications between the child and the therapist made in the course of the therapist's professional employment.

Further, here we resolve any possible doubt against the court's power to waive the privilege for the child because DDHS had general responsibility for protecting the child from further harm, and the GAL was responsible for representing the child's interests in the legal proceeding. *See* § 19–3–203(3), C.R.S.2010 ("The guardian ad litem shall be charged in general with the representation of the child's interests."); *L.G. v. People,* 890 P.2d at 654.

■ No Colorado case has decided whether, in a D & N proceeding, either the petitioning entity or a GAL has the authority

to waive a child's privilege. To the extent that the juvenile court ruled they do not, we disagree as to the GAL, for two reasons.

First, in the context of ongoing litigation, such authority would be consistent with the broad powers of a GAL to "sue or defend" on behalf of an infant or incompetent person. *See* C.R.C.P. 17(c); *cf. Wittrein,* 221 P.3d at 1083. And in other jurisdictions, an existing or specially appointed GAL may determine whether the child's privilege should be asserted or waived where, as here, a parent is conflicted and the child is not sufficiently mature to make the decision. *See In re Berg,* 152 N.H. 658, 886 A.2d 980, 984–88 (2005) (collecting cases).

Second, and more importantly, here the GAL did not present the court with a recommendation on express waiver. *See* § 19–3–203(3) (powers of a GAL in a D & N proceeding include "mak[ing] recommendations to the court concerning the child's welfare"). Rather, we have concluded that the GAL's conduct in releasing the letter, if within her authority, constituted an implied waiver. We discern no basis on which to conclude that releasing the letter exceeded the GAL's authority under section 19–3–203(3), even if the ultimate and perhaps unintended consequence of a broader waiver was not in the child's best interests.

Here, the record does not show either disagreement between DDHS and the GAL over disclosing privileged information in the letter or prompt action by DDHS to preserve the privilege when faced with disclosure by the GAL. Thus, we need not and do not decide the separate authority of DDHS to preserve the privilege on the child's behalf notwithstanding contrary action of the GAL.

Having concluded that the privilege was validly waived, we turn to whether the juvenile court properly limited the waiver by

(Colo.2009) (guardian ad litem appointed by the trial court to represent the interests of the child in her mental health records determined that it was not in the child's best interests to waive her privilege as to the records).

2. *See In re Kristine W.,* 94 Cal.App.4th 521, 114 Cal.Rptr.2d 369, 373–74 (2001) (in juvenile dependency context, "therapy has a dual purpose—treatment of the child to ameliorate the effects of

abuse or neglect and the disclosure of information from which reasoned recommendations and decisions regarding the child's welfare can be made"; thus, under California law, therapist could reveal "circumscribed information" to accomplish information-gathering goal of therapy, while child's confidential communications with therapist and details of the therapy remained privileged).

denying mother access to the therapist's file. The court did not address either the GAL's unilateral disclosure of the therapist's letter or privileged information disclosed by DDHS beyond what the court had allowed, the scope of which is at best unclear. In any event, because privileged information from the therapist portrayed mother negatively, and this information was used by DDHS and the GAL in seeking to terminate her parental rights, we further conclude that the court deprived mother of a fundamentally fair opportunity to protect those rights. *Cf. People v. Madera,* 112 P.3d 688, 691 (Colo.2005) (defendant's ineffective assistance of counsel claim impliedly waives attorney-client privilege "to the extent necessary to give [his] opponent a fair opportunity to defend against it") (internal quotations omitted).

▊ A privilege operates as an exception to Colorado's broad discovery rules. If an asserted privilege has been waived, then discovery is proper, subject to determining the scope of the waiver, in light of the circumstances of the case. *See Hartmann v. Nordin,* 147 P.3d 43, 49–53 (Colo.2006) (where physician-patient privilege has been waived, the district court does not abuse its discretion in basing its discovery order on the relevancy of the information sought to a claim or defense).

Here, in our view, the waiver extended at least to all material in the therapist's filed that supported, related to, or contradicted the therapist's statements and opinions as presented in the February 18 letter and the therapist's testimony at the hearing. Nevertheless, we acknowledge the argument of DDHS and the GAL, on which the juvenile court made no finding, that disclosure of this information could be detrimental to the ongoing therapeutic relationship. Hence, on remand, the parties shall promptly confer and determine whether they can all agree to allow the court to decide the case on the basis of the evidence that remains after excluding all information from the therapist. Should they so agree, the court must make new findings based on the remaining evidence. But if they do not agree, mother is entitled to a new hearing to determine whether her parental rights should be terminated.

Before retrial, the court shall conduct an in-camera review of the therapist's file, which is not before us, to identify the portions of the file that we have held are discoverable. If mother contends that the scope of the waiver should be broader, or if any party contends that the court should consider testimony of the therapist relating to events following the original termination hearing, the court must consider such arguments and identify any additional portions of the file that it deems discoverable. Those portions of the file should be provided to mother, subject to any limitations that the court may order to preclude further dissemination of the materials. Having so concluded, we need not address mother's arguments that disclosure of the file was also required under CRE 612.

## IV. Conclusion

The judgment is vacated, and the case is remanded to the juvenile court with instructions to order DDHS to give notice of the proceeding to the Cherokee Nation and to inquire among the child's paternal relatives as to possible Indian heritage. If the child's paternal relatives provide information sufficient to trigger the notice provisions of the ICWA with respect to additional tribes, notice must be given to those tribes in accordance with the provisions of the ICWA and the Children's Code. If the child is determined to be an Indian child, any additional proceedings required to address the privilege issue must be conducted in accordance with the ICWA, unless the juvenile court cedes jurisdiction over this case to a tribal court. *See People in Interest of T.M.W.,* 208 P.3d at 275; *People in Interest of J.O.,* 170 P.3d 840, 844 (Colo.App.2007).

Judge CASEBOLT and Judge DAILEY, concur.