25CA0588 Peo in Interest of JL 09-11-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 25CA0588
El Paso County District Court No. 23JV30720
Honorable Robin Chittum, Judge

_____

The People of the State of Colorado,

Appellee,

In the Interest of J.L., a Child,

and Concerning A.B.,

Appellant.

_____

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE MEIRINK
Fox and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 11, 2025

_____

Kenny Hodges, County Attorney, Andrew Herlihy, Assistant County Attorney, Colorado Springs, for Appellee

Debra W. Dodd, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1    In this dependency and neglect proceeding, A.B. (father) appeals the judgment allocating parental responsibilities for J.L. (the child) to the foster parents.  We affirm.

I.    Background

¶ 2    The El Paso County Department of Human Services filed a petition in dependency and neglect because the child was born prematurely and tested positive for methamphetamines at birth. After spending three months in a neonatal intensive care unit, the child was placed with a foster family upon his discharge from the hospital.  The child has severe medical issues, including breathing problems, visual problems, a seizure disorder, and trouble swallowing.  Father admitted that the child was born exposed to substances and the parties agreed to a deferred adjudication.  The juvenile court then adopted a treatment plan requiring father to (1) cooperate with the Department; (2) engage in family time with the child; (3) eliminate substance abuse by completing a substance abuse assessment and following all recommendations; (4) develop and demonstrate protective capacity; (5) maintain stable housing and income; and (6) complete "family preservation/life skills services" to assess and maintain safe parenting skills to provide for

1

J.L.'s physical, emotional, and developmental needs. Eleven months later, after first moving to terminate father's parental rights, the Department moved to allocate parental responsibilities to the foster parents.

¶ 3    Nearly nineteen months after the petition was filed, the juvenile court held a contested custody hearing and entered an order allocating parental responsibilities (APR order) to the foster parents.

## II.    Discussion

¶ 4    Father asserts that the juvenile court abused its discretion when it awarded father only "minimal" family time with the child on a supervised basis. We disagree.

### A.    Applicable Law and Standard of Review

¶ 5    In dependency and neglect proceedings, the juvenile court has jurisdiction to allocate parental responsibilities between parents and nonparents. §§ 19-1-104(5)-(6), 19-3-702(4)(a)(V), C.R.S. 2025; *People in Interest of E.Q.*, 2020 COA 118, ¶ 10. When doing so, a juvenile court must consider the legislative purposes of the Children's Code under section 19-1-102, C.R.S. 2025. *See People in Interest of A.S.L.*, 2022 COA 146, ¶ 12. The overriding purpose of

2

the Children's Code is to protect a child's safety and welfare by providing procedures that serve the child's best interests. *L.G. v. People in Interest of K.G.*, 890 P.2d 647, 654 (Colo. 1995). Therefore, the court must allocate parental responsibilities in accordance with the child's best interests. *People in Interest of L.B.*, 254 P.3d 1203, 1208 (Colo. App. 2011).

¶ 6 The allocation of parental responsibilities is a matter within the juvenile court's discretion. *See In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. It is for the court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence, and to assess the credibility of witnesses. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). And when the juvenile court's findings have record support, its resolution of conflicting evidence is binding on review. *B.R.D.*, ¶ 15. But whether the court applied the correct legal standard in making its findings is a question of law that we review de novo. *People in Interest of N.G.G.*, 2020 COA 6, ¶ 10.

### B. Analysis

¶ 7 The juvenile court found, with record support, that father had not followed through on his treatment plan because he had not

completed substance abuse treatment, established monitored sobriety, or participated in life skills services. Yet, father argues that he was "actively engaged throughout the case" and "had addressed treatment plan objectives," so unsupervised family time would have been in the child's best interests. Specifically, father asserts that he completed recovery court, demonstrated sobriety, and obtained stable housing and employment. However, the record does not support father's claims that he completed treatment or demonstrated sobriety.

¶ 8    The caseworker testified that father had a history of substance use and relapsed early in the case but then participated in an inpatient treatment program after his release from the Department of Corrections. However, father was unable to complete his treatment because the facility shut down. Rather than continue treatment through the Department, father told the caseworker that he would seek services through parole, but he never signed paperwork allowing the caseworker to confirm his participation in a treatment program or sobriety monitoring.

¶ 9    Father asserts in his opening brief that he "completed recovery court and graduated from that program." But the record contains

no reference to father's alleged graduation from drug court or successful completion of any recovery court. To the contrary, father testified that he "messed up drug court."

¶ 10 Regarding other treatment plan objectives, the caseworker testified that she asked father if he wanted to participate in family preservation and life skills services, but father never let her know "if he [was] in agreement with that," and she did not want to place a referral for it to "just sit there . . . and there be no engagement." The caseworker acknowledged that father had housing and employment. She testified that father lived with his mother, whom he was caring for, but this living arrangement was "a big strain for him." And father's mother smoked in the home, which presented a "very large concern" given the child's medical needs. The caseworker opined that the child "should not be in that home."

¶ 11 Next, father contends that he could have cared for the child without supervision because he was aware of and willing to address the child's needs. The juvenile court found that the child had exceptional medical needs and that father was willing to learn about those needs but had not done so.

¶ 12      The record supports the court's findings. The caseworker testified that the child was born prematurely, exposed to methamphetamine, and experienced medical conditions that required ongoing intervention. The caseworker also testified that (1) the child was unable to swallow liquids that were not thickened because of the risk of aspiration; (2) he couldn't eat "regular food" so all of his food had to be pureed; (3) he required breathing treatments, especially when he "overwork[ed] himself"; (4) he had to be monitored for seizures; and (5) he was going to get tested to see if "any genetic diagnosis [was] maybe playing into some of these delays." The child attended medical appointments approximately three times per week, including physical, occupational, speech, and feeding therapy.

¶ 13      Father argues the Department failed to provide him with "necessary training." The caseworker testified that father was provided with the child's medical records on an ongoing basis, but father still did not understand the child's medical needs. And the foster parents messaged father "every single time" there was a medical appointment, but he attended only about ten percent of them. When asked at the custody hearing whether father would

have been willing to take a "course in pediatric emergency care," he testified that "parenting classes . . . were offered" but that with parole, a full-time job, and taking care of his mother, "time gets away from you."

¶ 14    Additionally, although father regularly participated in family time, the caseworker testified that he had not developed "parental protective capacity."  For example, during one visit, father gave the child water and coffee, which were not thickened and would have caused the child to aspirate.  The caseworker testified that giving the child these unthickened liquids was a massive safety concern.  And father was unable to have family time alone with the child because when the foster mother left a visit, the child cried "hysterically," which required him to receive breathing treatments.  Based on these concerns, the caseworker opined that expanding father's family time too quickly would be "very detrimental" to the child.

¶ 15    Accordingly, because the record supports the juvenile court's findings, we discern no abuse of discretion in the entry of the APR order.  *See B.R.D.,* ¶ 15.

### III.  Disposition

The judgment is affirmed.

JUDGE FOX and JUDGE BROWN concur.